1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK

2

3     UNITED STATES OF AMERICA,     *        Docket No. 12CR084
                                    *
4                                   *
                                    *
5                                   *        Buffalo, New York
                   v.               *        February 6, 2013
6                                   *        10:06 a.m.
                                    *
7     HAROLD HOWARD,                *
                                    *
8                  Defendant.       *
                                    *
9     * * * * * * * * * * * * * * * *

10

11               TRANSCRIPT OF TRIAL, VOLUME 2
               BEFORE THE HONORABLE RICHARD J. ARCARA
12               UNITED STATES DISTRICT JUDGE

13

14
     APPEARANCES:
15

16    For the United States:     MELISSA MARANGOLA, ESQ. and
                                 Assistant United States Attorney
17                               GEORGE BURGASSER, ESQ.
                                 Assistant United States Attorney
18

19
     For the Defendant:         ANTHONY PENDERGRASS
20

21

22
     Court Reporter:            YVONNE M. GARRISON, RPR
23                              Official Court Reporter

24

25

          (Jury present in the courtroom at 10:06 a.m.)

          THE CLERK:  Criminal Action 2012-84A, United States versus Harold Howard.  Jury trial.

          Counsel, please state your name and the party you represent for the record.

          MS. BURGASSER:  George Burgasser for the government, Your Honor.

          MS. MARANGOLA:  Melissa Marangola on behalf of the government, Your Honor.

          MR. PENDERGRASS:  Anthony Pendergrass on behalf of Harold Howard.

          THE COURT:  Good morning, everyone.

          (Off the record discussion.)


          THE COURT:  All right.  Ladies and gentlemen, we're ready to start the trial.  And would you please administer the oath to our jury.

          THE CLERK:  Will all jurors please rise?

          (Jurors and alternates sworn.)

          THE COURT:  Well, ladies and gentlemen, we are now ready to begin the trial, and I'm going to give you a few preliminary instructions to guide you in your participation in this trial.  Many of the things I will be saying now, or said yesterday, but now you're sworn in as jurors, and it's important that I repeat those.

1        It will be your duty to find from the evidence what

2  the facts are, and you and you alone will be the judges of the

3  facts, and then you will have to apply those facts to the law

4  as I give it to you, and you must follow the law whether you

5  agree with it or not.

6        Now, nothing that the Court may say during the course

7  of the trial is intended to indicate or should be taken by you

8  as indicating as to what your verdict should be.  The evidence

9  from which you will find the facts will consist of the

10  testimony of witnesses, any documents or other items that have

11  been received in evidence, and any facts that the parties may

12  agree or stipulate to.

13        Certain things are not evidence and must not be

14  considered by you, and I'll state some at this time:

15  Statements, arguments or questions by lawyers are not evidence,

16  objections to questions are not evidence.

17        Now, as we said yesterday, lawyers have an obligation

18  to their clients to make an objection when they feel that the

19  evidence being offered is improper under the rules of evidence.

20  You should not be influenced by the objection or by the Court's

21  ruling on it.

22        If the objection is sustained, the witness will not

23  be permitted to answer the question, and, therefore, you should

24  simply ignore the question.  If the objection is overruled, the

25  witness will be permitted to answer the question, and,

therefore, you will consider the answer as like all the other evidence in this case.

If you are instructed that some item of evidence is being admitted for a limited purpose, you must follow that instruction and consider it for the purpose that it was admitted.

Now, testimony the Court may exclude or told you to disregard is not evidence and must not be considered. Sometimes a question is asked, there's an objection, and the witness may blurt out the answer and the objection is sustained. Well, you've already heard the question and the answer, and I've ruled that it's not a proper question. I'm going to tell you to disregard it and you must disregard the question and the answer.

Anything that you may have seen or heard about this case or any other case is not evidence and must be totally disregarded.

Now, there are two kinds of evidence. One type of evidence is called direct evidence, which is direct proof of a fact such as the witness of an eyewitness -- the testimony of an eyewitness, I saw John Jones walking down the street. That's called direct evidence.

Circumstantial evidence is proof of facts from which you may infer or conclude from other facts. And I'll go into a little more detail at the end of the trial as far as what the

difference is between direct and circumstantial evidence.

There's no -- the law makes no difference between direct or circumstantial evidence.  It does require that before the defendant can be found guilty, you must be satisfied beyond a reasonable doubt that he is.

Now, most of the evidence you will consider will be offered by the testimony of witnesses.  It will be up to you to decide which witness to believe and which witnesses not to believe and how much of a witness' testimony that you will accept or reject.

In determining what evidence you will accept, you must make your own evaluation on the testimony given by each of the witnesses and determine the degree of weight you chose to give to his or her testimony.  The testimony of a witness may fail to conform to the facts they heard because the witness is simply not telling the truth, or maybe the witness did not accurately see or hear that about what he or she is testifying about, or maybe the witness' recollection is faulty in some way, or maybe the witness may not be able to express himself or herself clearly in giving his or her testimony.

There's really no magic formula by which one may evaluate testimony, but you do bring with you into this courtroom all of the experience and background of your lives. In your everyday affairs you determine for yourselves the reliability or unreliability of statements made to you by

1    others.

2           The same tests that you use in your everyday dealings

3    are the tests that you should apply during your deliberations.

4    Does the witness have an interest or a lack of interest in the

5    outcome of the case, does the witness appear to be biased or

6    prejudiced in some way, the appearance or the manner in which

7    the witness gives his or her testimony, and the opportunity

8    that witness may have been to observe the facts about what he

9    or she is testifying about, the probability or improbability of

10   the witness' testimony when viewed in light of all the other

11   evidence in this case are all items to be taken into

12   consideration in determining what weight, if any, you will

13   assign to that testimony.

14          One matter here.  Ms. Granat, do you need a hearing

15   aid today?

16          MS. GRANAT:  Yeah, I'm fine.

17          THE COURT:  You're fine?

18          MS. GRANAT:  Yes, I'm closer to you.

19          THE COURT:  If during the trial you want to use the

20   hearing --

21          MS. GRANAT:  I will let you know.

22          THE COURT:  Let me know.

23          Okay.  If such considerations, this is considering

24   the witness' testimony, make it appear that there is

25   discrepancy in the evidence, you'll have to consider whether

the apparent discrepancy may be reconciled by fitting the two stories together.  If, however, that is not possible, then you'll have to determine which of the conflicting versions that you will accept.

Now, as you know, ladies and gentlemen, this is a criminal case, and there are some basic rules in a criminal case which you must keep in mind, and we talked about them yesterday.

The defendant is presumed innocent of the charges that have been filed against him.  The indictment against the defendant brought by the government is only an accusation, nothing more.  It is not proof of guilt or anything else.  The defendant, therefore, starts out with a clean slate.

Second, the burden of proof is on the government to prove its case beyond a reasonable doubt as to each count charged in the indictment.  The defendant has no burden to present any evidence or to testify.  The defendant has a right to remain silent, and the law prohibits you in arriving at a verdict when considering the fact that a defendant may not have testified.

In this case the defendant is charged with a five-count indictment with violating federal law.  You must base your verdict solely on the basis of evidence or lack of evidence against the defendant.

The indictment charged the defendant with Count 1,

narcotic conspiracy; Count 2, possession of cocaine with the
intent to distribute; Count 3, possession of a firearm in
furtherance of a drug trafficking crime; Count 4, being a
person convicted of a felony who possessed a firearm shipped in
interstate commerce or foreign commerce; and, fifth, the
possession of an unregistered firearm.

I'm going to read you the five counts in their
entirety.

Count 1 charges as follows:  That between on or about
November, 2008, the exact date being unknown, and on or about
November 16th, 2011, in the Western District of New York and
elsewhere, the defendant Harold Howard did knowingly,
willfully, and unlawfully combine, conspire, and agree with
others, known and unknown, to commit the following offenses;
that is, to possess with the intent to distribute and to
distribute five kilograms or more of a mixture and substance
containing cocaine, a Schedule II controlled substance, in
violation of Title 21 United States Code Section 841(a)(1),
841(b)(1)(A), all in violation of Title 21 United States Code
Section 846.

In order to satisfy its burden of proof with respect
to Count 1 of the indictment, the government must establish
each of the following two essential elements beyond a
reasonable doubt:  First, that two or more persons entered into
an unlawful agreement charged in the indictment starting

sometime in November, 2008, and ending on November 16th, 2011;

second, the defendant knowingly became a member of the

conspiracy.  And I'll explain to you in more detail the

definition of what is -- under the law what is a conspiracy.

That will be at the end of the trial.

Count 2 charges on or about November 16th, 2011, in

the Western District of New York, the defendant Harold Howard

did knowingly, intentionally, unlawfully possess with intent to

distribute 500 grams or more of a mixture and substance

containing cocaine, a Schedule II controlled substance in

violation of federal law.

In order to satisfy the burden of proof with respect

to Count 2, the government must establish three essential

elements beyond a reasonable doubt:  One, that the defendant

possessed narcotic drugs; second, that he knew that he

possessed narcotic drugs; and, three, the defendant possessed

narcotic drugs with intent to distribute them.

Count 3 of the indictment charges on or about

November 16th, 2011, in the Western District of New York, the

defendant Harold Howard in furtherance of drug trafficking

crimes for which he may be prosecuted in a Court of the United

States, and that is a violation of Title 21 United States Code,

Section 841(a)(1) and 846 as -- and 846(a) as is sets forth in

Counts 1 and 2 of this indictment.

The allegations, that's the allegations in Count 1

1  and two are incorporated herein by reference, did knowingly and

2  unlawfully possess firearms including machine gun, namely a

3  Haskell model JS-45 semiautomatic 45-caliber pistol bearing

4  Serial Number 007819; a Rossi model 38 special 38-caliber

5  revolver bearing Serial Number 207746; and an SWD, Incorporated

6  MD-11/nine fully automatic machine begun bearing Serial Number

7  87-0003317, all in violation of United States Code

8  Section 924(c)(11) and 924(c)(1)(B)(1).  Basically talking

9  about three weapons; an alleged machine gun, a 45-caliber

10 pistol, and a 38-caliber resolver.

11        In order to satisfy its burden of proof with respect

12 to Count 3, the government must establish the following two

13 elements beyond a reasonable doubt:  That the defendant

14 committed a crime -- strike that -- the defendant committed a

15 drug trafficking crime for which he must be prosecuted in a

16 court of the United States; and, second, the defendant

17 knowingly possessed a firearm in furtherance of the crime, a

18 crime charged in Count 1 and Count 2.

19        Count 4 of the indictment charges on or about

20 November 16th, 2011, in the Western District of New York the

21 defendant Harold Howard, having been convicted on or about

22 December 18th, 1998, in county court, Erie County, New York, of

23 a crime punishable by imprisonment of a term exceeding one

24 year, unlawfully did knowingly possess in and effecting

25 commerce firearms, namely those same firearms that I just

stated a few minutes ago.  This is all in violation of Title 18 United States Code 922(g)(1) and 924(a)(2).

In order to satisfy its burden of proof with respect to Count 4 of the indictment, the government must establish each of the following three essential elements beyond a reasonable doubt:  First, that the defendant was convicted in any court of a crime punishable by imprisonment of a term exceeding one year; and the defendant knowingly possessed a firearm as charged; and, third, that the possession charge was in or effecting interstate commerce.

Count 5, which is the final count, is that on or about November 16th, 2011, in the Western District of New York, the defendant did knowingly possess a firearm -- namely, the same firearms that we just referred to in Count 3 -- that was not registered to the defendant in the National Firearms Registration and Transfer Record, all in violation of federal law.

In order to satisfy its burden of proof with respect to Count 5, the government must establish the following three elements beyond a reasonable doubt:  First, that on or about the date alleged in the indictment, the defendant had possession of a firearm, namely a machine gun; second, the defendant had knowledge that he was possessing a firearm; and, third, that the firearm was not registered to the defendant in the National Firearm Registration and Transfer Record.

1        I'll give you, again, more detail at the end of the

2   trial, ladies and gentlemen.  Those are the five charges and

3   the elements.

4        Now, a few words about your responsibilities as

5   jurors.

6        First I instruct you that during the trial you are

7   not to discuss the case with anyone or permit anyone to discuss

8   the case with you until you retire to the jury room at the end

9   of the case to deliberate on your verdict.  You simply are not

10  to talk about the case, even among yourselves, during the

11  course of the trial.  I went into detail at the end of

12  yesterday about that.  That's still important.  It will be

13  important until the trial has been concluded.

14       Second, you should not read anything about the case

15  in the event that there's anything published in the newspaper

16  or listen to any radio coverage or any telephone coverage.  In

17  the event that there is such coverage and you should do so

18  inadvertently or should anyone talk to you about the case,

19  please bring it to the Court's attention promptly by advising

20  my courtroom deputy or the deputy marshal.

21       Third, do not try to do any research or conduct any

22  investigation about the case on your own.  You as jurors must

23  decide the case solely on the evidence presented here within

24  the four walls of this courtroom.  This means that during the

25  trial you must not conduct any independent research about the

case.  As we've talked about yesterday, you should receive no information from anybody about this case other than what occurs here.

Finally, do not form an opinion until you've heard all the evidence in this case.  Keep an open mind throughout the trial.  You're instructed not to take any notes but to pay careful and close attention to all the witnesses and what they say and all the activities in the courtroom because you are to confine your deliberations to the evidence presented here.

You're instructed not to mingle with the lawyers, any of the witnesses, or the parties.  As I said yesterday in this regard, if you happen to run into anyone, they will ignore you. Don't take offense.  They are only acting properly.

Your oath requires you to render a verdict upon the evidence submitted and on the rulings of the Court.  Keep this in mind during the course of the trial.

The trial itself will now begin.  First the government will make an opening statement.  An opening statement is simply an outline to help you understand the case as the government intends to present it and the evidence that will be presented.

Next defense counsel may make an opening statement. Defense counsel does not have to make an opening statement. Opening statements are neither evidence nor arguments but only to help you understand what the case is all about.

1        The government will then present its witnesses, and

2  counsel for the defendant may cross-examine the witnesses.

3  Following the government's case, the defendant, if he wishes,

4  presents witness whom the government may then cross-examine.

5        After all the evidence is in, the attorneys will then

6  present their closing arguments and summarize and interpret the

7  evidence for you, and then the Court will instruct you on the

8  law.  After that, you will retire to deliberate on your

9  verdict.

10        During the course of the trial I may occasionally

11  need to talk to the attorneys without you present.  Please do

12  not attach any significance whatsoever to that.

13        Also, from time to time I may ask questions of

14  witnesses.  You should not take these questions as indicating

15  any opinion that the Court may have concerning the case, the

16  witnesses, or the evidence being presented.  It simply means

17  I'm clarifying things or moving things along.

18        With those preliminary instructions, we'll now have

19  the opening statement by the government.

20        You have a couple individuals at your table.  Please

21  introduce them.

22      MS. MARANGOLA:  Good morning, ladies and gentlemen.

23  As you've been introduced to Mr. Burgasser, he is my cocounsel

24  in this case.  At the table behind Mr. Burgasser and myself is

25  Trish Prawel.  She's a paralegal with the United States

1  Attorney's office.  And Jeremy Lehning is a task force agent

2  with the DEA.  He's a case agent on this case.

3          And with that, good morning, ladies and gentlemen.

4          JURORS:  Good morning.

5          MS. MARANGOLA:  Why are we here?  Well, we're here

6  because the defendant owns a 2008 Hummer, and on November 16th

7  of 2011, officers located three kilos of cocaine, two loaded

8  firearms, and a loaded fully automatic machine gun in the back

9  of his car.

10          And how will we know that that car belongs to the

11  defendant?  Well, you'll hear, first off, that car's registered

12  to the defendant, and he leased the car during the time the

13  drugs were found in there.  And, more importantly, on the date

14  the drugs and the machine gun were found in the back of his

15  car, the defendant was arrested.  And what was found in his

16  pocket?  The keys to the Hummer.

17          What is also important is where the Hummer was

18  located.  You see, you're going to hear this vehicle wasn't

19  parked in some random parking lot or being driven by some other

20  person, no.  Law enforcement found the Hummer in a garage in

21  the backyard of his girlfriend's house at 39 Elmer Street.

22          And let me set the stage for you, ladies and

23  gentlemen.  This garage was not visible from the street.  It's

24  set in the backyard of Paula Cruz's home, who you'll hear is

25  the defendant's girlfriend, and the yard itself is surrounded

by an eight-foot stockade fence that covers the driveway as
well.  So you can't really see the garage that's behind it.

And in the backyard are the defendant's pit bulls
which were let loose and running around protecting the Hummer
and the garage where the three kilos of cocaine and the machine
gun were found.  That's why we're all here, ladies and
gentlemen.

Now, you'll hear that November 16th, 2011, wasn't an
isolated incident.  You see, throughout the course of the
conspiracy, the defendant has been caught by law enforcement in
cars on two separate occasions, and you'll hear about those
over the next few days as well.

You'll hear in 2008, the defendant was stopped by a
law enforcement officer right outside Atlanta, Georgia, with
$104,000 in vacuum-sealed bags and a loaded firearm.

Then in 2009, you'll hear he was stopped right here
in Buffalo, pulled over by the Buffalo Police Department and
the New York State Police, and in his car at that time was
about $1,000 worth of cocaine and another loaded firearm.

So, again, this is not an isolated incident, ladies
and gentlemen.  This is a case that shows the defendant's
ongoing cocaine dealing over the course of the conspiracy which
was three years.

Now, over the course of the next week or so you're
going to hear from a slew of witnesses in this case, from law

enforcement officers to firearm experts to forensic experts who tested the cocaine and the drugs that were found with the defendant on the various dates.

And you're also going to hear from one very important witness. You're going to hear from someone who knows the defendant better than anyone and specifically the defendant's drug trafficking better than anyone. You're going to hear from his partner in crime. His name is Myron Johnson. And he's going to sit in that chair either late today or tomorrow and tell you all about his partnership with the defendant, everything that's happened from the beginning of this conspiracy in 2008, straight to the date of his arrest.

So you're not going to have any guessing to do as you sit there. He's going to tell you in 2008, the defendant approached him about dealing drugs in Buffalo, New York. You're going to hear that, like clockwork, for every month since then from 2008, right up to the date of his arrest, the defendant would rent vehicles, drive down to Atlanta, Georgia, with about $100,000 a pop, pick up three to four kilos, and bring it back to Buffalo, New York, for sale, and Myron Johnson would be right there waiting for him when he got back. They would package the drugs together, and they would sell them at a lucrative price.

You're going to hear over the three-year period this defendant and Myron Johnson made hundreds of thousands of

 1    dollars doing it.  And he's going to tell you that's the reason

 2    that the defendant, even though he was stopped by law

 3    enforcement in 2008, and stopped by law enforcement in 2009,

 4    just kept going.  It wasn't the love of drugs.  It was the love

 5    of money.  When you're making that much money, you can't just

 6    stop.  So the risk was worth it to the two of them.

 7            Myron Johnson's also going to explain to you the ways

 8    they evaded law enforcement during those three years.  You see,

 9    over the three years they get pretty good at what they were

10    doing.  And Myron Johnson's going to explain to you how they

11    rented cars, where they hid the drugs in the cars, how they

12    used stash houses.  And over the course of the week all these

13    terms will become familiar to you.

14            And he's going to tell you that although the drug

15    trafficking profession is a very lucrative profession, you can

16    make tons of money, it's also a very dangerous profession.

17    See, he'll explain to you, as a drug dealer, not only are you

18    worried about the police finding you, which is why you have to

19    sneak around in rental cars and things like that, you also have

20    to be concerned for rival drug dealers that are in your

21    neighborhood or the street kids who want to rip you off, and

22    that's where the guns come in.

23            Myron Johnson's going to take you back to 2008, and

24    right up to November 16th, 2011, and he's going to be quite

25    candid with you.  And I want to be upfront with you right now

that Myron Johnson was arrested with the defendant on
November 16th, 2011.  And, frankly, he's going to plead guilty
and accept responsibility for his charges in Federal District
Court.

But he's not going to testify for me because he's a
nice guy.  Make no mistake.  He's just as guilty as the
defendant.  He's testifying here because he wants a deal.  He
wants his sentence reduced as a result of his testimony.  Okay?
So I want to be upfront and clear with you right off the get-go
that that's the defendant, that's the defendant and that's his
partner.

And I didn't pick him as a witness.  The defendant
did when he decided to get in cahoots with him and start
dealing drugs.

So as you listen to Myron Johnson's testimony, keep
in mind that, again, he's the defendant's partner, and you're
supposed to use that when you assess someone's credibility, but
I also want you to make sure you pay attention to how his
testimony fits in with all the other testimony you're going to
hear from all the other officers in this case, because, again,
in a nutshell, you're going to hear from the officers who
pulled the defendant over in 2008, from the officers who pulled
the defendant over and found the items in 2009, and then you're
going to hear from the first three witnesses of the case today,
which are the investigators who located the kilos and the

machine gun in the back of his car.

They're going to tell you about the investigation leading up to that date and the months that obviously led up to it where they were following the defendant around, making observations of him and Myron together. Okay.

Again, every witness in this case adds their own little piece of the puzzle. It's not going to be in a chronological order. Due to scheduling, some of the witnesses are going to be called out of order. So what I'm going to ask from you over the next three days or a week is just to really pay attention and wait until the end, because until you hear from everybody, things aren't going to fit together. Okay? So we'll wait until the end.

And at the end of this case, when I get to come up here again and give you my closing argument, I'm going to tie everything together for you.

That's the case in a nutshell, ladies and gentlemen. And I know -- or excuse me -- I know Judge Arcara keeps talking about this indictment, and he's read you the charges again, but quickly I want to go through the indictment, because this is a really important document.

See, not only does it tell the defendant exactly what he's charged with, but more importantly for me, it tells me the exact elements that I need to prove to you beyond a reasonable doubt, and that's what this case is. My job is to prove the

elements to you beyond a reasonable doubt, and your job is to hold me to that burden but nothing more, nothing less.

So what I want to do just very briefly is go through the five charges again in this indictment and tell you what evidence I expect you'll hear that will prove each charge so that way you guys know what to listen to over the next week. Okay?

Count 1, as the judge pointed out, is conspiracy to distribute five grams or more -- excuse me -- five grams or more of cocaine. During the three years you're going to hear Myron Johnson testify about how many drugs, how many kilograms they brought into Buffalo over the three-year period.

But keep in mind, the times that he was pulled over in 2009, you'll hear the drugs were found in his car. That goes into the conspiracy charge too. And the three kilograms of cocaine that was found in the back of his car on the date of his arrest, November 16th, 2011, those can be counted for this conspiracy too. Okay? So Count 1 is really a catchall. Every witness that you hear from on that stand is going to encompass part of that conspiracy.

Now, Counts 2, 3, 4, and 5 all go to the date of his arrest, and, again, the judge read them a couple times, but we'll go through them again quickly.

Count 2, the defendant is charged with possession of 500 grams or more of cocaine with the intent to distribute, and

that's for the three kilograms that were found in the back of

his car on the date of his arrest and those only.  You're going

to hear from a chemist in this case, Michelli Schmitz, and

she's going to tell you that she weighed the drugs and tested

the drugs found in the back of his car, and she's going to tell

you that three kilograms is well over 500 grams.  Okay?  So

that's going to be very simple.  So the only thing for you to

consider is did he possess those on that date.  Here's the

testimony you have to listen to.  Okay?

The first witness I'm going to call is D.J.

Granville.  He's the investigator who located the drugs in the

back of his car.  He's going to testify about how they were

packaged, where the Hummer was.  Remember, in the back of his

girlfriend's house in a locked garage surrounded by his pit

bulls in a house that, again, is surrounded by a stockade

fence.

So you have to really pay attention to who had

control over those drugs, because that's the question for you.

Okay?

Listen to Deputy Hawthorne who will be my second

witness of the day.  He's going to tell you that he and a

partner of his are the ones who found the keys in the

defendant's pocket at the time of his arrest.  Okay?  All of

those facts go to who could exercise possession over the drugs

in that car.  Make sense?

Count 3, were the three firearms including the machine gun possessed in furtherance of his drug trafficking? So here's the question:  Are they related in any way?  Well, listen to Myron Johnson, and listen to what he tells you about how they use guns and drugs together to make money selling cocaine.

And, frankly, look at the photographs of where the drugs and the guns were found in the back of the Hummer. You're going to see a photograph that they're all hidden in the same compartment.  So to say that they're unrelated, I just don't know how you can even say that.  Okay?

Count 4 charges the defendant with being a felon in possession of the firearms that were located in the back of his truck.  You're going to hear a stipulation that's going to be read into the record where the defendant's admitting that he was a prior felon on the date those guns were found in his car. So that's not going to be an issue.

So, again, the only thing for you to decide is did the defendant know the guns were in the back of his car, did he possess them on that date.  Very simple.

And Count 5 is possession of an unregistered machine gun.  Now, it may sound silly, but if you do possess a machine gun in this country, you have to register it with the ATF. That's how they keep track of those because they are such dangerous instruments that they need to keep track of who

possesses them and for what reason.

Well, you're going to hear that the defendant didn't register this machine gun with the ATF. Okay? And you're going to hear an expert come in from Washington, D.C. who is in charge of the database and searched that firearm to make sure it wasn't registered, and that's it in a nutshell.

Now, again, I ask you to bear with me. You're going to hear from probably 20 witnesses in this case, and, as I stated, they each add their own piece of the puzzle. So please wait until the end of this case before you render any judgments. Okay? And I'm convinced that should you listen to all the of the testimony in this case and view the overwhelming physical evidence in this case, that you'll find the defendant guilty of all charges.

MR. PENDERGRASS: Where's the beef? That's what I thought of with regards to this whole case. That commercial that was out in the early '80s, remember the lady from Wendy's? Where's the beef? Where's the beef? Because I think at the end of the day, there's not going to be any beef and you're going to be left wondering, where's the beef?

See, they're charging Mr. Howard with a conspiracy. Now, the interesting thing is that in a conspiracy, there needs to be some people, you know, that you're conspiring with to sell drugs, right? But it's going to be interesting, right, because you're not going to see anybody. You're not going to

see a group of people, in fact, walking up to the stand to show

you that there's a conspiracy, right?

You're not going to see anyone else charged in this

indictment.  And as the judge has read the indictment to you,

Ms. Marangola has read the indictment to you, no one else

charged in the indictment with a conspiracy.  Where's the beef?

If there's a conspiracy, there should be a bunch of

coconspirators.  If there's a conspiracy, that means it takes

two or more people to enter into a conspiracy and that there

should be two or more people walking in here and saying, yes, I

conspired with Harold Howard to sell drugs.  But you will not

hear that, right, because there wasn't a conspiracy.

I'll tell you simply what happened.  On

November 16th, 2011, Harold Howard is in a vehicle with his

friend, Myron Johnson, a person that he thought was his friend

at the time.  He's in that vehicle with Myron Johnson.  Myron

Johnson is a drug trafficker, and you'll learn that Myron

Johnson in his vehicle at that time had drugs loaded to the

hilt in the vehicle.

But Harold Howard is in the vehicle at that time,

having met Myron Johnson at 93 Elmer where Myron Johnson and

his mother moved into.  See, the district attorney -- the

prosecutor here didn't tell you -- she says, well, that house

belonged to Howard Johnson, but she didn't tell you that Myron

Johnson and his mother were living in that house using that

house.  What you're going to learn is that Myron Johnson's mother had a lease to that house, to that apartment.

What you are going to learn from the evidence is that when they went into 93 Elmer, the house that belonged to Paula Cruz -- well, it was rented to Ms. Deborah Lee at the time.

And what you also is going to learn is that at the time they went into the house, they didn't find stuff in 93 Elmer that belonged to Harold Howard, no.  They found stuff in 93 Elmer that belonged to Myron Johnson and Deborah Lee.  Those were the two individuals that resided at 93 Elmer.  My client used the driveway area.  He had dogs, so they let him use the driveway area.

But what else you're going to learn is that on that date and -- on November 16th that Myron Johnson was simply in the car with his friend having come from 93 Elmer where his friend picked him up at and drove over to 43 Ruspin.  Got to 43 Ruspin, Mr. Johnson ran into his house, and they were back out and went off to do whatever they were going to do, totally innocuous.

And after they went off, they were at Myron Johnson's home, Myron Johnson received a call from his mother.  You will learn that.  And they circled back around, Myron Johnson, Mr. Howard.  Myron Johnson told Mr. Howard I want -- I need to go back over to the house and check on why the alarm is going off.

Got back to the house.  The alarm was going off
because investigators -- investigators from the sheriff's
department was executing a warrant at 43 Ruspin, not a house
that Mr. Howard resided in.  They were executing a warrant at
43 Ruspin, upper apartment, on a guy named John Thurman.

And you will learn that they were executing this
warrant on that apartment because they had what they call a
garbage pull.  They went into the garbage.  They thought that
there was some drug activities -- some drug activities going on
at 43 Ruspin.  They went into the garbage and pulled out some
stuff that indicated that there was drug activities going on at
43 Ruspin.  So they executed a search warrant on 43 Ruspin
upper.

Myron Johnson walked into his house, came back out.
The police officers that were on site executing a warrant on
the upper apartment stopped Myron Johnson to figure out what
his association was with that address.  Myron Johnson is
talking to them.

Deborah Lee, Myron Johnson's mother, who is in the
house with Myron Johnson's children, opens the door.  And when
she opens the door, staying quiet about what's going on with
her children -- I mean with her child, the police officer looks
inside the apartment.  And lo and behold, what do they see?
They see drugs all over the apartment.

So they entered the apartment.  In the apartment, you

will learn that there's drugs all over this apartment.  So now

they got Myron Johnson caught red-handed, right?  And then you

will learn that also -- so they went and got a search warrant,

and they searched the apartment, and they found drugs in the

couch in the apartment.

And this sort of reminded me about green eggs and

ham.  You know, they found drugs.  They found drugs here.  They

found drugs there.  They found drugs everywhere, right?  But

what you will learn is that they never found drugs on Harold

Howard.

They simply have Myron Johnson, after they have found

the drugs all over his house and large sums of money all over

his house, say those are not mine, those don't belong to me,

those belong to Harold Howard.  That's why Harold Howard is

sitting in this courtroom today by himself with no

coconspirators are in sight.  No coconspirators in sight

because Myron Johnson said, okay, let me offer up to you Harold

Howard so I can save my own behind.  That's what he did.  He

saved his own behind.

Now, what you will also learn when the investigating

officer takes the stand is that they found not only drugs in

the house where Myron Johnson lived with his mother, but they

found a gun in the house, right.  So Myron Johnson says, well,

you know, this is my house, right, but none of the drugs that

are being found in the house belongs to me, they all belong to

Harold Howard, right.

So you've got money and drugs and a gun at 43 Ruspin that my client has no relationship to. And no one would be able to come in here and tell you that they saw Harold Howard at 43 Ruspin or that they saw him there with any level of regularity.

They're simply going to rely on one guy who was caught with the goods -- one guy caught with all of the goods, then turned around and said, they belong to him.

Now, my client wasn't using his 2008 Hummer. My client has a 2008 Hummer, and, you know, gas is expensive now, so my client simply asked his friend can I park my vehicle in your garage because I don't have a garage where I live.

And Myron Johnson, who knew my client for more than ten years, said yeah, you can park my vehicle -- your vehicle in my garage. And so -- and my client, you will hear, left Myron Johnson with the keys for that vehicle. Myron Johnson is using my client's vehicle.

His -- here's what else you will learn, that this was purportedly a 14-month investigation. This was purportedly a 14-month investigation. You will -- you will not see one single note, investigatory note about the movement of my client between 93 Elmer and 43 Ruspin.

You will not see one single note about the movement of my client driving in that vehicle around the city. You know

why?  Because he wasn't.  He left the vehicle parked in the garage at 43 Ruspin is what you will hear, right.

What you will learn is that Myron Johnson says, well, later on my client came with all of these kilos of cocaine and was trying to hold it at 43 Ruspin but he wouldn't let him do it.  Well, I want you to use your common sense here, right.  If my client -- if they were partners and they agreed on drug trafficking and all this stuff, right, then why wouldn't Myron Johnson allow my client to hold the drugs in the vehicle at that house?

All right.  At the end of the day, I'm going to expect that you will conclude that this was a bunch of hogwash, that Myron Johnson was, in fact, holding drugs but not drugs that belonged to Harold Howard, not drugs that belonged to Harold Howard, drugs that belonged to Myron Johnson, and now because he got caught, he's trying to blow it off on Harold Howard.

The other thing that you will learn here, yeah, they get drugs out of the 2008 Hummer, and, yes, the 2008 Hummer belonged to Harold Howard, but they went and they did something.

You know, there's this thing called DNA, deoxyribonucleic acid.  It's the new thing, this modern investigatory techniques, right.  That DNA stuff is the stuff that you have on your fingers, your skin, your sweat, saliva.

It comes from -- it's something that is emitted by your body. And when you touch something, DNA sheds off on those things that you touch, and it's like a fingerprint. It's like a fingerprint. It says that you came into contact with that stuff.

And what you're going to learn is that the Erie County CPS did some tests. They did some tests on the drugs that was located in the 2008 Hummer. And what the testimony I expect to be is Myron Johnson's going to tell you that he saw my client handling this stuff with his hands and stuff. He told my client that you can't bring that here. He saw my client handling that stuff personally, told my client put that stuff away, right.

But what you're going to hear from the testimony and what's going to cause you to -- to very seriously consider the testimony of Myron Johnson is that that stuff, that DNA stuff, that deoxyribonucleic acid, that fingerprinting stuff, right, that tells who you are, my client's stuff wasn't on it. My client's DNA wasn't on it.

In fact, the drugs at 43 Ruspin that Myron Johnson is going to say my client -- that those drugs belonged to my client, my client's DNA wasn't on that stuff. The gun at 43 Ruspin, my client's DNA wasn't on that stuff.

So here's what they have. They want you to believe that there's a conspiracy because my client was arrested in

1  2009 on a drug and weapons charge.  And, by the way, my client

2  stands convicted of those charges, recently convicted of those

3  charges, all right, just so that we have that out of the way,

4  that you understand that my client is convicted and he's paying

5  his debt to society on that charge, right.

6        But what you won't find here is that you won't find

7  one connection to Harold Howard with the drugs that were found

8  at 93 Elmer, and you won't find not a single connection to

9  Harold Howard with the drugs that were found at 43 Ruspin.

10        Moreover, what you won't find is a single connection

11  with the guns found at 93 Elmer, with the drugs or the guns

12  found at 43 Ruspin.  You won't find DNA.  The only thing that

13  you will find is a guy who has a lot to lose -- who has a lot

14  to lose when looking at a very long time in jail.  He said hold

15  on, I am going to get myself out of this trouble and I am going

16  to put it off on Harold Howard.

17        Now, here's the interesting thing, and, you know, I

18  spent some time thinking about this.  They say that Harold

19  Howard conspired with Myron Johnson to sell drugs in Western

20  New York, Buffalo, Erie County, yet Harold Howard is the only

21  one that stands accused and charged in this indictment.

22        Now, Myron Johnson stands accused and charged in a

23  separate indictment, and you'll learn this, right.  And he

24  stands accused and charged in a separate indictment charging

25  him with the drugs that were found at 43 Ruspin.  So this is a

conspiracy, right?  Why not charge Harold Howard and Myron

Johnson together.  Why charge them independently of the drugs

that they are trying to say that they independently had in

their possession?  If this is a conspiracy, one would think

that, you know, Harold Howard, would have been charged in the

same indictment that Myron Johnson was charged in.

MS. MARANGOLA:  Objection, Your Honor.

THE COURT:  Well, it's -- I guess he's going to try

to prove this because this is the purpose of what an opening

statement is.

You may continue, sir.

MR. PENDERGRASS:  They simply have nothing.  And I

don't want you to look at the tap dance that's going to go on

in this Court and believe it for anything more than a tap

dance.

See, the founders of -- of this country had it right,

right, when they say we hold these truths to be self-evident

that all men are created equal, that they are endowed by the

creator with life, liberty, and the pursuit of happiness.  They

understood that life was liberty, and liberty was the pursuit

of happiness, and the pursuit of happiness meant life and it

meant liberty.

MS. MARANGOLA:  Objection, Your Honor.

THE COURT:  Sustained.

MR. PENDERGRASS:  The evidence is going to show --

the evidence is going to show you -- the evidence will show you

that Harold Howard had nothing, nothing whatsoever to do with

the drugs that were located at 43 Ruspin.  The evidence is

going to be plain as day that the drugs recovered from 93

Elmer, the place where Harold Howard's fiance, Paula Cruz,

allowed Myron Johnson and his mother to live, evidence is going

to show you -- show you that Harold Howard had nothing to do

with those drugs or the weapons that are in that vehicle.

So, yeah, over the course of this next week, I want

you to sit there, I want you to pay attention, I want you to

use your common sense.

And at the end of this trial -- and I'm not going to

ask you today because you haven't heard anything yet -- but at

the end of the trial, I get to come back and I'm going to have

a conversation with you about what I suspect the evidence to

show, and then I'm going to ask you what I need for you to do

then.

But right now, I want you to look at Harold Howard.

Everyone look at him.  He's not guilty.  Remember what the

judge told you about presumption of innocence.  And, you know,

I'm going to tell you right from the door that Harold Howard

will not get on that stand and testify.  So I'm simply going to

let you know that all up front.  He will not testify.

But the evidence will be enough to show that there's

reasonable doubt, and at the end I'll come back and talk to you

again about what the evidence and the facts shows.

Okay.  Thank you very much.

THE COURT:  All right.  Ladies and gentlemen, we'll take a 15-minute recess.  During the recess please do not discuss the case with anyone.  Do not discuss it among yourselves.  We'll return at 11:10.  The Court will be in recess.

(A recess was taken at 11:02 a.m.)

THE COURT:  All right.  Ms. Marangola.

MS. MARANGOLA:  The government calls Deputy Granville to the stand.

THE CLERK:  Please state your full name and spell your last name for the record.

THE WITNESS:  D.J. Granville, last name is G-R-A-N-V-I-L-L-E.

THE CLERK:  So it's D period, J period?

THE WITNESS:  Yes, ma'am.


D.J. GRANVILLE, SWORN,


THE COURT:  All right.

MS. MARANGOLA:  Should I start, Your Honor?

THE COURT:  Yes, please.

DIRECT EXAMINATION

BY MS. MARANGOLA:

Q.   Sir, can you state your full name for the record and tell us where you're employed?

A.   D.J. Granville.  I'm a detective at the Erie County Sheriff's Department.

Q.   Describe for the jurors what your duties include in your present employment.

A.   Currently assigned to the narcotics and intelligence bureau.

Q.   How long have you been assigned to that particular unit?

A.   Approximately three years.

Q.   And was that your only position with the sheriff's department?

A.   No, I worked as a road deputy for approximately a year. Prior to that, I was a transit policeman for three years, and prior to that I was a Buffalo housing policeman for eight.

Q.   Throughout your entire law enforcement experience, can you describe approximately how many narcotics investigations you've been involved with?

A.   Hundreds.

Q.   And based on that training and experience, are you familiar with how drugs are packaged for sale in Buffalo, New York?

A.   Yes.

Q.   Are you familiar with how drugs are transported in Buffalo, New York?

A.   Yes.

Q.   Have you ever assisted the federal government in larger scale drug transactions or trafficking investigations?

A.   Yes, I have.  From approximately 2001-2005, I was assigned to the FBI Safe Streets Task Force, and we investigated large scale narcotics operations.

Q.   Based on that experience, are you familiar with how large quantities of drugs, including cocaine, are moved across the country?

A.   Yes.

Q.   Are you familiar with what a source city is?

A.   Yes, I am.

Q.   And would you consider, based on your training and experience, Atlanta to be a source city?

          MR. PENDERGRASS:  Objection.

          THE COURT:  Overruled.

          THE WITNESS:  Yes, I do.

BY MS. MARANGOLA:

Q.   Can you describe for the jurors what a source city even is?

A.   A source city is a city that has large -- that has access to a large amount of narcotics, Atlanta being one, New York

1  City being one.  Many -- based on my experience, we've

2  determined that many individuals have traveled from the

3  Buffalo, New York area or Western New York area to cities such

4  as Atlanta and New York City.

5  Q.   Now, I'm going to direct your attention back to March

6  2010, and ask if you became aware of an individual by the name

7  of Harold Howard during that time period.

8  A.   Yes.

9  Q.   Can you describe for the jurors how you became aware of

10 this individual?

11 A.   Through a confidential informant.

12 Q.   And what, if any, information did you receive from the

13 confidential informant?

14         MR. PENDERGRASS:  Objection, Your Honor.

15         THE COURT:  Sustained.

16         MS. MARANGOLA:  Your Honor, I'm not offering it for

17 the truth of the matter.  I'm offering it to show what effect

18 it had on the listener.

19         THE COURT:  Sustained.

20 BY MS. MARANGOLA:

21 Q.   Did this confidential informant, without getting into what

22 this individual said to you, did it cause you to do anything?

23         MR. PENDERGRASS:  Objection, Your Honor.

24         THE COURT:  Overruled.

25         What did you do after you talked to this person, sir?

1    THE WITNESS:  Yes.  After we spoke to this

2 individual, we conducted a background check, conducted drive-by

3 surveillance.

4 BY MS. MARANGOLA:

5 Q.   Now, after meeting with this informant, did you open an

6 investigation with respect to Harold Howard?

7 A.   Yes.

8 Q.   Can you describe for the jurors what you did at that point

9 in terms of your investigative techniques?

10 A.   First and foremost, we obtained a picture of Harold

11 Howard, obtained a criminal history for Harold Howard.  We

12 identified a location we believed to be a stash location for

13 Mr. Howard.

14 Q.   I'm going to stop you right there.  What was the address

15 of that stash house location that you just described?

16 A.   93 Elmer Street.

17 Q.   Is that located here in the City of Buffalo?

18 A.   Yes, ma'am.

19 Q.   And did you have the occasion to personally drive by and

20 observe that premises on various dates?

21 A.   Yes.

22    MS. MARANGOLA:  Your Honor, may I approach the

23 witness with two pieces of evidence?

24 BY MS. MARANGOLA:

25 Q.   Deputy Granville, I'm showing you what's marked for

1  identification as 16A and 16B, two photographs.  I'll ask you

2  to take a look at them and tell us if you recognize what's

3  depicted in those exhibits.

4  A.   Yes, I do.

5  Q.   Can you tell us what is depicted in those two photographs?

6  A.   Both photographs of 93 Elmer Street in the City of

7  Buffalo.

8  Q.   And do those photographs fairly and accurately depict that

9  residence as you observed it during the course of your

10  investigation?

11  A.   Yes.

12       MS. MARANGOLA:  Your Honor, I'll offer Government

13  Exhibit 16A and 16B at this time.

14       MR. PENDERGRASS:  No objection, Your Honor.

15       THE COURT:  All right.  They'll be received.

16       (The following were received in Evidence:

17       Government's Exhibit 16A and 16B.)

18       MS. MARANGOLA:  May I publish 16A to the jury at this

19  time, Your Honor?

20       THE COURT:  Yes, please.  Publish both of them.

21       MS. MARANGOLA:  Now showing the jury what's been

22  marked into evidence as 16A.

23  BY MS. MARANGOLA:

24  Q.   Can you describe what we're looking at?

25  A.   It would be the front side of 93 Elmer Street.

1          MS. MARANGOLA:  And if you could show 16B, please.

2    BY MS. MARANGOLA:

3    Q.    Describe the portion of the house as shown in 16B, please.

4    A.    The fence separating the front driveway to the rear of the

5    residence including the garage.

6    Q.    And is that an accurate view of what you would see of that

7    residence if you were standing on the street?

8    A.    Yes.

9    Q.    And to the right portion of 16B, there's the stockade

10   fence; is that accurate?

11   A.    That's correct.

12   Q.    Does that cover the driveway portion of 93 Elmer Street?

13   A.    Yes, it does.

14   Q.    Can you see just generally behind that stockade fence?  Is

15   there a building behind that?

16   A.    Yes, you could see the roof portion of the garage.

17   Q.    Now, how many times approximately have you drove by that

18   house during your investigation?

19   A.    I drove by it a countless number of times to the point

20   where I was kind of driving my partners nuts.

21   Q.    And when you would drive by that location on a regular

22   basis, was that fence or gate to the driveway typically opened

23   or closed?

24   A.    Closed at all times.

25   Q.    Could you ever see behind the stockade fence from your

1   view?

2   A.   No.

3   Q.   Did you determine based on your investigation who owned 93

4   Elmer Street?

5   A.   Yes.

6   Q.   And who did you determine owned that house?

7   A.   Mr. Howard's fiance, Paula Cruz.

8   Q.   And did you determine where Paula Cruz resided?

9   A.   Yes.

10  Q.   In what state did she live in?

11  A.   She lived in Atlanta, Georgia.

12  Q.   Did she base -- well, strike that.

13       Throughout the months that you were driving past 93 Elmer,

14  did you ever see the defendant at that location?

15  A.   Yes.

16  Q.   And can you describe what he would do when you would see

17  him?

18  A.   We observed the defendant at the porch area of the

19  residence and in front of the residence.

20  Q.   Was there a lot of activity at that location or no?

21  A.   I wouldn't say there was a lot of activity.  Based on my

22  experience we've observed user-type individuals go to and from

23  the residence.  This was not occurring at this house.

24  Q.   When you are saying you've seen user-type activity,

25  describe what you mean for the jurors in layman's terms.

```
 1              THE COURT:  He didn't say that.  He said "user-type
 2   individuals."
 3   BY MS. MARANGOLA:
 4   Q.   When you say that what do you mean in layman's terms?
 5   A.   Individuals that use either cocaine, crack cocaine,
 6   heroin, and so on.
 7   Q.   And based on your training and experience in drug
 8   investigations, would you typically see users arrive at a
 9   certain location and leave shortly thereafter?
10   A.   Yes.
11   Q.   Did you see --
12              THE COURT:  Do they look any different than anybody
13   else?
14              THE WITNESS:  Judge, based on my training and
15   experience, yes.  There were certain physical characteristics
16   genuinely -- or generally they were individuals that were
17   skinny, their eyes sunk in the rear of their head.  Typically
18   there were scratch marks or cuts on their face.  That's what
19   users do when they can't obtain their drug of choice.  They
20   generally pick at their face.  They get extremely nervous.
21              THE COURT:  All right.
22   BY MS. MARANGOLA:
23   Q.   And did you say that was the type of activity you noticed
24   at this address or it was not?
25   A.   It was not.
```

1  Q.  What observations -- or what type of activity did you see

2  at this location?

3  A.  We didn't see a lot of foot traffic.  We observed other

4  individuals, other than Mr. Howard, in front of the residence.

5  We observed newer-type vehicles.  Those individuals that were

6  located in the front of the house were dressed very nicely.

7  They were dressed with expensive clothes.

8  Q.  Did you ever see a vehicle or a 2008 Hummer at that

9  location?

10  A.  Yes.

11  Q.  Was this during the course of your surveillance?

12  A.  Yes, it was.

13  Q.  Can you describe that for the jurors?

14  A.  We seen the Hummer, the 2008 Hummer, Mr. Howard's Hummer

15  parked in the driveway short of the fence.

16  Q.  When you say "short of the fence," are you saying on the

17  side closest to the street?

18  A.  That's correct, and it was -- and it was a minimal amount

19  of occasions.

20  Q.  Now, you indicated that that vehicle belonged to the

21  defendant.  How did you determine that that 2008 Hummer was the

22  defendant's?

23          THE COURT:  What do you mean, "minimal amount of

24  occasions"?

25          THE WITNESS:  On not too many occasions we observed

1  the vehicle there.

2          THE COURT:  All right.

3  BY MS. MARANGOLA:

4  Q.   How did you determine that that car belonged to the

5  defendant as you just testified?

6  A.   After obtaining the plate which was attached -- the New

7  York State plate which was attached to the vehicle, we ran that

8  plate through our dispatch and determined that it was, in fact,

9  registered to a Mr. Harold Howard.

10  Q.   During -- approximately how much were you surveilling the

11  defendant before his arrest on November 16th, 2011?

12  A.   Our investigation began in March of 2010.

13  Q.   During that time period, did you ever see anyone operate

14  the 2008 Hummer?

15  A.   Yes.

16  Q.   And were you able to visually identify the individuals in

17  that Hummer when you observed it?

18  A.   Yes.

19  Q.   Who were they?

20  A.   The individual operating the vehicle was Ms. Paula Cruz.

21  Mr. Howard was located in the front passenger seat.

22  Q.   And you've had the opportunity throughout the course of

23  this investigation to physically observe Mr. Howard; is that

24  correct?

25  A.   That's correct.

1  Q.   And is the Mr. Howard that you're referring to in the

2  courtroom today for purposes of the record?

3  A.   Yes.

4  Q.   Can you identify the individual that you're describing as

5  Mr. Howard and describe something he's wearing?

6  A.   He's seated at the defense table with a long-sleeved

7  collared blue shirt.

8  Q.   Thank you.

9       MS. MARANGOLA:  Your Honor, I'd ask that the record

10 reflect that Deputy Granville identified the defendant.

11 BY MS. MARANGOLA:

12 Q.   Moving on.

13      During the time of the -- of your surveillance, did you

14 also have the opportunity to review the travel patterns of the

15 defendant?

16 A.   Yes.

17 Q.   And was this a follow-up investigation to the information

18 you received from the confidential informant?

19 A.   Yes.

20 Q.   Can you describe what you observed during the

21 investigation with respect to Mr. Howard's travel patterns?

22 A.   After receiving the information, we were advised that --

23      THE COURT:  I don't want you to talk about what you

24 were told.  What did you do after you talked to whoever this

25 person was?

1           THE WITNESS:  After I spoke to the confidential

2    informant, as I said, I then ran a photograph of Mr. Howard, a

3    criminal history.  I determined that in 2009 Mr. Howard was

4    arrested on Delaware Avenue in the city.

5           MR. PENDERGRASS:  Objection, Your Honor.

6           THE COURT:  Sustained.

7    BY MS. MARANGOLA:

8    Q.   Did you determine that Mr. Howard lived out of the area --

9    out of Buffalo, New York, for a period of time?

10          MR. PENDERGRASS:  Objection.

11          THE COURT:  Overruled.

12          THE WITNESS:  I was aware that Mr. Howard spent some

13   time in Atlanta.

14   BY MS. MARANGOLA:

15   Q.   And, again, you indicated earlier that Ms. Cruz lived in

16   Atlanta; is that correct?

17   A.   That's correct.

18   Q.   Throughout the investigation did you determine whether or

19   not the defendant was driving back and forth from Atlanta to

20   Buffalo?

21   A.   Yes.

22   Q.   Throughout the period that you were surveilling the

23   defendant prior to his arrest, have you ever observed the

24   defendant in vehicles other than the 2008 Hummer?

25   A.   On the day of his arrest, we observed Mr. Howard in a

1   rental vehicle.

2   Q.   During this time period were you attempting to use

3   conventional investigative techniques with this defendant

4   including controlled purchases or things of that nature?

5              MR. PENDERGRASS:  Objection.

6              THE COURT:  Well, the answer is yes or no.  I'll

7   overrule it.

8              THE WITNESS:  Yes.

9   BY MS. MARANGOLA:

10  Q.   And based on the information you learned of the defendant,

11  did you determine whether or not those investigative techniques

12  would be useful in this investigation?

13  A.   They would not be useful.

14  Q.   Can you describe to the jurors why, based on your training

15  and experience, those measures would not be useful?

16  A.   Based on the agency that I was employed by, the Erie

17  County Sheriff's Office, we didn't have access to large amounts

18  of U.S. currency, funds to purchase narcotics, and our

19  information was that Mr. Howard was selling large amounts of

20  cocaine, crack cocaine.

21             MR. PENDERGRASS:  Objection.

22             THE COURT:  Overruled.

23  BY MS. MARANGOLA:

24  Q.   Were your physical observations of this defendant during

25  your surveillance consistent with the information you received

1  from the confidential informant?

2          MR. PENDERGRASS:  Objection.

3          THE COURT:  Sustained.

4  BY MS. MARANGOLA:

5  Q.  You indicated that you surveilled the defendant for

6  approximately -- well, over a year; is that correct?

7  A.  Yes.

8  Q.  And based on your training and experience, were his

9  movements consistent with a large scale drug trafficker?

10 A.  Yes.

11 Q.  Based on your training and experience, do large scale drug

12 traffickers sell on street corners?

13 A.  No.

14 Q.  And can you describe for the jury why you -- why you say

15 that?

16 A.  Large scale drug traffickers typically don't sell to a lot

17 of individuals.  They keep their circle small.  That's to

18 protect themselves from having informants speak about them.

19 Q.  And who are the -- well, what level drug dealer would you

20 typically find on a street corner selling to drug fiends?

21 A.  It would be an individual that was selling extremely small

22 bags of, again, crack cocaine, cocaine, heroin.

23 Q.  So that's not what you found in this case, correct?

24 A.  That's correct.

25          THE COURT:  Ms. Marangola, please don't lead.

1          MS. MARANGOLA:  Okay.  Yes, Your Honor.

2   BY MS. MARANGOLA:

3   Q.   You indicated earlier that you learned the defendant was

4   stopped in 2009.  Were you involved in that at all?

5   A.   No.

6   Q.   Based on the information you received from the informant,

7   without getting into what it was, did another name come up in

8   this investigation?

9          MR. PENDERGRASS:  Objection.

10         THE COURT:  Well, he can say yes or no, but that's as

11  far as he's going with that.

12         THE WITNESS:  Yes.

13  BY MS. MARANGOLA:

14  Q.   Okay.  Throughout your investigation and surveillance,

15  were you tracking the movements of the 2008 Hummer?

16  A.   Yes.

17  Q.   Did you ultimately see the 2008 Hummer at a second

18  location?

19  A.   Yes.

20  Q.   Can you describe for the juror -- jurors, excuse me --

21  where that was?

22  A.   Just by happenstance we observed the 2008 Hummer parked in

23  the rear right corner of 43 Ruspin with the front of the

24  vehicle facing towards the street.

25  Q.   And at that point did you make a connection between 93

1   Elmer Street and 43 Ruspin with respect to this investigation?

2              MR. PENDERGRASS:  Objection, Your Honor.

3              THE COURT:  Rephrase your question.

4   BY MS. MARANGOLA:

5   Q.  Once you observed the Hummer at 43 Ruspin, what, if

6   anything, did that mean to you and with respect to this

7   investigation?

8   A.   It simply connected the dots for us.  We knew there was a

9   correlation between 93 Elmer and 43 Ruspin.

10  Q.   Did you already know that there was a connection between

11  93 Elmer and 43 Ruspin?

12  A.   No, not till we observed the Hummer parked in the rear of

13  the residence.

14  Q.   Where is 93 Ruspin located?  Is that in Buffalo?

15  A.   Yes, sir, Buffalo Police Department E District.  It's

16  located on Bailey Avenue and Langfield.  This would be a block

17  or two over.

18             THE COURT:  Okay.  How far away is it from the Elmer

19  Street?

20             THE WITNESS:  Not far at all, Your Honor.  Take

21  Bailey to Kensington, take a left on Kensington, and it's there

22  on your right-hand side.

23             THE COURT:  Are they basically the same neighborhood?

24             THE WITNESS:  Yes.

25             THE COURT:  All right.

BY MS. MARANGOLA:

Q.   Now, as you indicated earlier, 43 Ruspin was on your radar

at this point; is that fair to say?

A.   Yes.

Q.   I'm going to show you --

          MS. MARANGOLA:  If I may, Your Honor, Exhibit 1A.

          THE COURT:  All right.

BY MS. MARANGOLA:

Q.   Are you familiar with what's depict -- what's marked for

identification as Government Exhibit 1A?

A.   Yes.

Q.   What is it?

A.   It's a picture of 43 Ruspin.  Also located in the driveway

is a Jeep Cherokee SRT8, black in color, a vehicle.

Q.   Does that photograph fairly and accurately depict 43

Ruspin as you observed it during the course of this

investigation?

A.   Yes.

          MS. MARANGOLA:  I'll offer Government Exhibit 1A at

this time.

          MR. PENDERGRASS:  No objection.

          THE COURT:  It will be received.

          (The following was received in Evidence:

          Government's Exhibit 1A.)

          MS. MARANGOLA:  Publish 1A to the jury.

1 BY MS. MARANGOLA:

2 Q. You indicated, sir, that prior to this day you observed

3 the 2008 Hummer in the back of this residence; is that correct?

4 A. That's correct.

5 Q. Can you show the jurors by marking the screen -- I believe

6 that's how it works -- where you would have seen the Hummer?

7 A. It would have been back in this area. Sorry, it would

8 have been to the right of my little scribble mark. You can

9 barely see the Hummer as you drove past the residence. You

10 could see the left portion. Also the license plate was able to

11 be observed.

12 Q. Now, how many dates did you see the 2008 Hummer at 43

13 Ruspin Street?

14 A. I don't recall the exact number of dates, but it was not a

15 lot.

16 Q. Throughout the course of your investigation, did you hear

17 the name Myron Johnson?

18          MR. PENDERGRASS: Objection, Your Honor.

19          THE COURT: Overruled.

20          THE WITNESS: Initially --

21          THE COURT: The answer is yes or no.

22          THE WITNESS: Yes.

23 BY MS. MARANGOLA:

24 Q. Throughout the course of the investigation -- are you

25 aware of who Myron Johnson is as you sit here today?

1   A.   Yes.

2   Q.   You've met Myron Johnson before; is that correct?

3   A.   That's correct.

4   Q.   Now, had you ever seen Myron Johnson at 93 Elmer Street

5   during the course of your investigation?

6   A.   We observed --

7         THE COURT:  Not we.  You, sir.

8         THE WITNESS:  No.

9   BY MS. MARANGOLA:

10   Q.   So all the times you surveilled that location, you never

11   positively identified Myron Johnson at 93 Elmer Street; is that

12   correct?

13   A.   That's correct.

14   Q.   Now I'll direct your attention to early November of 2011,

15   and ask if you were working on this investigation during that

16   time period.

17   A.   Yes.

18   Q.   And is one of your investigative techniques the use of

19   search warrants?

20         MR. PENDERGRASS:  Objection, Your Honor.

21         THE COURT:  Overruled.

22         THE WITNESS:  Yes.

23   BY MS. MARANGOLA:

24   Q.   Can you describe for the jury what are the typical ways

25   you would obtain a search warrant or some of the common ways

1  you obtain a search warrant for a particular residence?

2  A.   You would take an individual, confidential informant, in

3  camera to see a judge to be interviewed to give us a search

4  warrant.  We would conduct trash pulls at the residence, things

5  of that nature.

6  Q.   What is a trash pull?

7  A.   We would typically -- we actually had a list --

8       THE COURT:  Are you talking about a search warrant?

9       MS. MARANGOLA:  Yes, Judge.

10      THE COURT:  Why don't you go into that without going

11  into all this detail?  Did you have a search warrant?

12      Did you have a search warrant, sir?

13      THE WITNESS:  Yes, sir, we were able to obtain a

14  search warrant.

15      THE COURT:  All right.  So you had a search warrant.

16  What did you do with it?

17      MS. MARANGOLA:  Well, Your Honor, if I may.

18  BY MS. MARANGOLA:

19  Q.   How did you obtain the search warrant at 43 Ruspin?

20      THE COURT:  You got a search warrant.  That's all you

21  have to have.

22  BY MS. MARANGOLA:

23  Q.   Now, can you describe 43 Ruspin?  Is that a duplex, sir?

24  A.   Yes.

25  Q.   And are they side-by-side or is it an upper or lower?

1   A.   Upper and lower.

2   Q.   When you obtained the search warrants for this premises,

3   were you familiar -- or did you know who lived there at the

4   time?

5   A.   No.

6   Q.   And describe why you were uncertain as to who resided in

7   the upper or lower residence.

8              MR. PENDERGRASS:  Objection, Your Honor.

9              THE COURT:  Why you didn't know; is that what you're

10  asking?

11             MS. MARANGOLA:  Yes, Judge.

12             THE COURT:  Why you didn't know.  Overruled.

13             THE WITNESS:  We did not know who resided there.

14             THE COURT:  You're talking about the Ruspin address

15  we're talking about?

16             MS. MARANGOLA:  Yes, Judge.

17             THE COURT:  Okay.

18             THE WITNESS:  Based on the inability to -- based on

19  my inability to identify individuals coming and going from the

20  residence.

21  BY MS. MARANGOLA:

22  Q.   Now, ultimately you obtained a search warrant for the

23  upstairs of that residence; is that correct?

24  A.   Yes.

25  Q.   And what was that based on?

```
 1            THE COURT:  Wait a minute.  I don't want to get into
 2    the contents of the search warrant.
 3            MS. MARANGOLA:  Your Honor, it's important in this
 4    case.
 5            THE COURT:  Did I just make a ruling?
 6            MS. MARANGOLA:  Yes, Judge.
 7            THE COURT:  I thought I did.
 8    BY MS. MARANGOLA:
 9    Q.   When you arrived -- okay.  Directing your attention to
10    November 16th of 2011, were you working on this case on that
11    date?
12    A.   Yes.
13    Q.   Were you conducting surveillance of 93 Elmer Street?
14    A.   Yes.
15    Q.   And may I --
16            MS. MARANGOLA:  Trish, may you please show
17    Government's Exhibit 16B to the jury which is received in
18    evidence.
19            THE COURT:  Yes, you may.
20    BY MS. MARANGOLA:
21    Q.   And this is a location you were surveilling that day; is
22    that correct?
23    A.   That's correct.
24    Q.   Describe for the grand -- excuse me -- describe for the
25    jurors what you observed at that location on that date.
```

1   A.   We observed a Kia Sportage, a rental vehicle SUV, backed

2   into the driveway of 93 Elmer in front of the fence.

3          THE COURT:  This is November 16th, 2011?

4          MS. MARANGOLA:  Yes, Your Honor.

5          THE COURT:  All right.

6   BY MS. MARANGOLA:

7   Q.   And when you say in front of the fence, it's on the side

8   closest to the street that's visible; is that correct?

9   A.   That's correct.

10   Q.   So that would be what you could see from the street,

11   correct?

12   A.   That's correct.

13   Q.   Could you see if anybody was sitting in that vehicle or if

14   the vehicle was unoccupied?

15   A.   Yes, Mr. Howard was observed sitting in the driver's seat

16   of the vehicle.

17   Q.   Do you recall what time of day you observed the defendant

18   sitting in that driveway?  Was it the morning or the afternoon?

19   A.   It was the early afternoon.

20   Q.   How long did you surveil the defendant sitting in that Kia

21   Sportage during that afternoon?

22   A.   For a couple of hours.

23   Q.   Can you describe for the jury what the defendant was doing

24   during those couple of hours?

25   A.   Yes.  He was seated in the driver's seat of the vehicle.

1  Q.  Can you describe how he was sitting in that vehicle?

2  A.  Just sitting in the driver's seat kind of reclined

3  slightly.

4  Q.  When you initially drove by that location did you

5  determine someone was sitting in it or no?

6  A.  Yes.

7  Q.  Was anybody else in the vehicle with the defendant on that

8  date?

9  A.  No.

10  Q.  And where were you in reference to the defendant during

11  that time period?

12  A.  I was parked on the same side of the street as 93 Elmer, a

13  short distance away.

14  Q.  Were you working with any law enforcement partners on that

15  date?

16  A.  Yes.

17  Q.  And who were they?

18  A.  Detective Warren Hawthorne and Detective Tim Carney.

19  Q.  Are they also employed by the Erie County Sheriff's

20  Office?

21  A.  Yes.

22  Q.  Were they seated in your undercover police vehicle on that

23  date with you?

24  A.  Yes.  I would have been the driver of the vehicle, and

25  either Mr. Hawthorne or Carney were located in the front seat

1  and one of the rear seats.

2  Q.   Now, after a few hours of watching the defendant, what did

3  you and your partners do?

4  A.   We departed that location.

5  Q.   And what was the purpose of your departure?

6  A.   We had to utilize the restrooms.

7  Q.   During that time period, did you ever see anybody come or

8  go from the defendant's rental vehicle?

9  A.   No.

10  Q.   Did you see any other activity at that location during

11  that three-hour time span?

12          MR. PENDERGRASS:  Objection, Your Honor.

13          THE COURT:  Overruled.

14          THE WITNESS:  No, we did not -- I did not.

15  BY MS. MARANGOLA:

16  Q.   Now, once you left the location to use the restroom, what

17  did you do?

18  A.   We then traveled back to the vicinity of 93 Elmer Street.

19  Q.   Approximately how long did it take for you to return to

20  that location?

21  A.   Fifteen or twenty minutes.

22  Q.   When you returned, was the rental vehicle still in that

23  location?

24  A.   No.

25  Q.   What had changed about what you had seen from earlier?

1  Was anybody there?

2  A.   No, not to our knowledge.

3  Q.   So when you returned, the rental vehicle was gone,

4  correct?

5  A.   Yes.

6  Q.   Was the defendant gone as well?

7  A.   Yes.  He was not observed in front of the residence or

8  anywhere near the residence.

9  Q.   Now, with respect to your investigation, what did you and

10  your partners then do?

11  A.   We then applied for a search warrant at 43 Ruspin in the

12  upper apartment.

13  Q.   And, again, did you -- were you aware of who lived in the

14  upper apartment?

15  A.   No.

16  Q.   On that date, were you aware where Myron Johnson lived?

17  A.   No.

18  Q.   Did you know that Myron Johnson lived in the lower

19  apartment at 43 Ruspin when you executed the search warrant on

20  that day?

21  A.   No.

22       MS. MARANGOLA:  Can you take down 16B, please?  Can

23  you show 1A, please, which has been received into evidence?

24  BY MS. MARANGOLA:

25  Q.   Did there come a point on that evening --

```
 1            THE COURT:  Can we erase that?
 2   BY MS. MARANGOLA:
 3   Q.   -- that evening on November 16th, 2011, did you return to
 4   43 Ruspin to execute a search warrant?
 5   A.   Yes.
 6   Q.   And was there surveillance being conducted at that
 7   location as well?
 8   A.   Yes.
 9   Q.   Can you describe for the jury what happened with respect
10   to that surveillance when you went to execute the search
11   warrant?
12   A.   We were advised -- I was advised that the black -- black
13   Jeep that you see in the driveway at 43 Ruspin in the picture
14   had departed the location.
15   Q.   Did you know who was in that Jeep on that date?
16   A.   No.
17   Q.   And why did that make a difference to you in terms of
18   executing the search warrant, whether the Jeep was present or
19   not?
20   A.   Because we had connected the dots with the Jeep and 43
21   Ruspin to 93 Elmer Street.
22   Q.   And why was it important that people be at the location
23   when you executed the search warrant?
24   A.   You like to have -- I like to have individuals present in
25   the location.  If there's any evidence found, I can question
```

1  them further, conduct a further investigation.

2  Q.   So as you're heading to that location to execute the

3  search warrant, the Jeep was not there?

4  A.   No, it had just departed 43 Ruspin.

5  Q.   So what did you do upon learning that information?

6  A.   Stopped from proceeding to that residence and relocated

7  back to our briefing location.

8  Q.   Did you receive any information with respect to the Jeep

9  shortly thereafter?

10 A.   Yes.  The Jeep was surveilled leaving that residence and

11 circling the block and then arriving back at the residence.

12 Q.   When you received word that the Jeep returned to 43

13 Ruspin, what did you and your partners do?

14 A.   We then proceeded to that location with the intention of

15 executing the search warrant.

16 Q.   When you arrived at 43 Ruspin, was the black Jeep in the

17 driveway just as it appears in Government Exhibit 1A?

18 A.   Yes, it was.

19 Q.   Did there come a point where you and your partners

20 approached the Jeep?

21 A.   Yes.

22 Q.   When you pulled into that driveway or on the street to

23 execute the search warrant, can you describe for the jury what

24 you personally observed?

25 A.   I observed officers approach the Jeep as it was running

1    prior to entering the residence.  They approached the Jeep, and

2    they opened the passenger -- front passenger door of the Jeep.

3    Q.   Are you aware if anyone was in that vehicle at that time?

4    A.   Yes.  As I was passing by, I observed Mr. Howard seated in

5    the front passenger seat of the vehicle.

6    Q.   And that's the vehicle that's depicted in Government

7    Exhibit 1A; is that correct?

8    A.   Yes.

9    Q.   When you were arriving to execute the search warrant, were

10   you aware that the defendant, Mr. Howard, was in that Jeep?

11   A.   No.

12   Q.   And had you seen him since earlier in the day at 93 Elmer

13   Street in the rental vehicle?

14   A.   No.

15   Q.   What did you do after you saw the defendant sitting in the

16   passenger seat of that vehicle?

17   A.   Myself and other members of my team proceeded into the

18   upper apartment at 43 Ruspin.

19   Q.   And what, if anything, did you observe when you went to

20   execute the search warrant in the upper apartment?

21   A.   We executed the search warrant, and there was nobody

22   present in the residence.

23   Q.   A few minutes earlier when you arrived at the location,

24   did you see anyone exit the Jeep and go into the house?

25   A.   I did not.  Other law enforcement personnel notified us

1   that the driver of the Jeep --

2              MR. PENDERGRASS:  Objection.

3              THE COURT:  Overruled.

4              THE WITNESS:  -- that the driver of the Jeep had

5   exited the Jeep and proceeded to the side entrance of 43

6   Ruspin.

7   BY MS. MARANGOLA:

8   Q.   Now, at this point when you're upstairs and realize

9   nobody's home, what do you do next?

10  A.   We make the apartment safe.  Then I was traveling down the

11  stairs with the intention of going to the Jeep.

12  Q.   What, if anyone, did you see on the way to the Jeep?

13  A.   I observed Myron Johnson located in the doorway, the side

14  entrance doorway of 43 Ruspin.

15  Q.   What did you observe Myron Johnson doing?

16  A.   I observed him standing there.  Other law enforcement

17  personnel had notified me that Mr. Johnson was sneakily exiting

18  the lower apartment of 43 Ruspin.

19  Q.   Did there come a point where you approached Mr. Johnson?

20  A.   Yes.

21  Q.   And can you describe what happened when you did that?

22  A.   I approached Mr. Johnson, asked him where he lived, other

23  things of that nature.  He advised that he lived at 43 Ruspin

24  in the lower apartment.

25  Q.   Were there any other occupants present at that location

1    who lived in the lower apartment?

2    A.   Yes.

3    Q.   Who was that?

4    A.   Myron Johnson's mother, Deborah Lee.

5    Q.   Did you have any conversation with Deborah Lee at that

6    point?

7    A.   Yes.

8    Q.   And where did that take place?

9    A.   Inside the lower apartment at 43 Ruspin.

10   Q.   Were you invited into that apartment?

11   A.   Yes, I was.

12   Q.   By who?

13   A.   Ms. Lee.

14   Q.   When you were in that apartment, what, if anything, did

15   you see?

16   A.   Observed a quantity of marijuana located on a plate just

17   off the kitchen in a dining room area.

18   Q.   As a result of observing that as well as Harold Howard in

19   the Jeep outside, what, if anything, did you do?

20   A.   I asked Ms. Lee if she had resided at the residence, to

21   which she stated yes, just recently.  I asked her if she could

22   give us -- if she's willing to consent to a search of the

23   apartment.

24   Q.   And what was the response?

25   A.   No.

1  Q.    So what did you do next?

2  A.    We then secured the location, 43 Ruspin, the lower

3  apartment, and I drafted a search warrant which I obtained from

4  a judge.

5  Q.    Did you also obtain a search warrant for the Jeep that's

6  located in Government Exhibit 1A?

7  A.    Yes.

8  Q.    During this time period, where is the defendant?

9  A.    The defendant was located in the driveway of 43 Ruspin.

10  Q.    And as you're obtaining the search warrant, you or one of

11  your partners had Myron Johnson and the defendant separated

12  during this time period?

13  A.    Yes.

14  Q.    And did you have them remain securely at the location?

15  A.    Yes.

16  Q.    Ultimately, you or one of your partners comes back with

17  the search warrant signed by the judge; isn't that correct?

18  A.    Yes, I came back with the search warrant.

19  Q.    Did -- what did you do when you returned with the search

20  warrant?

21  A.    When I returned with the search warrant, I advised all law

22  enforcement personnel, along with Mr. Johnson and Ms. Lee, that

23  we were in possession of a search warrant and we were going to

24  conduct a search.  Ms. Lee and the children, I don't recall if

25  it was one or two children at the residence, were removed, and

1  then we commenced the search.

2  Q.   Did you personally assist in the search of that residence?

3  A.   Yes.

4  Q.   And describe for the jury what areas of the house you

5  searched.

6  A.   I searched the dining room area of the residence.  I also

7  searched the backward bedroom of the residence.

8  Q.   I'm going to show you, if I may, what's been marked for

9  identification as Government Exhibit 1D and 1E.

10      Do you recognize what's depicted in Government Exhibit 1D

11  and 1E, sir?

12  A.   Yes.  It would be the couch that was located in the front

13  room of 43 Ruspin, lower apartment.

14  Q.   Do those photos fairly and accurately depict that area as

15  you observed it back on November 16th of 2011?

16  A.   Yes.

17          MS. MARANGOLA:  I'll offer Government Exhibit 1D and

18  E into evidence at this time.

19          MR. PENDERGRASS:  No objection, Your Honor.

20          THE COURT:  All right.  They'll be received.

21          (The following were received in Evidence:

22          Government's Exhibits 1D and 1E.)

23          MS. MARANGOLA:  And I'd like to publish 1D to the

24  jury at the time.

25  BY MS. MARANGOLA:

1  Q.   Deputy Granville, can you tell us what we're looking at

2  here in Government Exhibit 1D?

3  A.   You're looking at -- we are looking at a cup holder

4  storage compartment area located between two seats of the

5  couch.

6  Q.   Was that an area that was searched by you and your

7  partners on November 16th, 2011?

8  A.   Yes.

9  Q.   I'm going to show you what's been marked or received into

10 evidence as Government Exhibit 1E, and can you describe for the

11 jury what we're looking at there?

12 A.   Yes.  After the plastic container was removed, we observed

13 a large amount of cocaine secreted in that area along with the

14 shoebox which also contained cocaine and a bunch of dryer

15 sheets.

16 Q.   Did you or one of your colleagues in your presence

17 retrieve the drugs from that location?

18 A.   Yes.

19 Q.   And what was done with those items once they were seized

20 from that location and photographed?

21 A.   They were ultimately submitted to the Erie County Central

22 Police Services laboratory.

23 Q.   Did you also have the occasion to search the basement of

24 that residence?

25 A.   My partner did, yes.

1    Q.   And did you have the personal opportunity to see what was

2    retrieved from the basement?

3    A.   Yes.

4    Q.   I'm going to show you what's been marked for

5    identification as Government Exhibits 1G and 1H.

6         Deputy, do you recognize what's depicted in those

7    photographs?

8    A.   Yes.

9    Q.   And what are they?

10   A.   In 1G there's a sock.  On top of the sock is a magazine

11   containing ammunition.

12   Q.   Do those photographs fairly and accurately depict the

13   firearm and the magazine with the ammunition as you observed

14   them back on November 16th, 2011?

15   A.   Yes.

16           MS. MARANGOLA:  I'll offer Government Exhibit G -- or

17   excuse me -- 1G and 1H into evidence at this time.

18           MR. PENDERGRASS:  No objection, Your Honor.

19           THE COURT:  All right.  It will be received.

20           (The following were received in Evidence:

21           Government's Exhibits 1G and 1H.)

22   BY MS. MARANGOLA:

23   Q.   Showing you what's been now received into evidence as

24   Government Exhibit 1H.  Can you describe for the jury what

25   we're looking at there?

1  A.   It's a semiautomatic handgun, black and grayish-silver

2  color, with a loose round located to the left of the barrel.

3  Q.   And showing you Government Exhibit 1G.  Can you describe

4  what is being depicted in that exhibit?

5  A.   It is a magazine containing ammunition.

6  Q.   And, again, you didn't personally locate that; is that

7  correct?

8  A.   That's correct.

9  Q.   One of your partners did?

10 A.   Yes.

11 Q.   And did you collect that as evidence or did one of your

12 partners do that as well?

13 A.   One of my partners did.

14 Q.   Were there other items that were seized from 43 Ruspin?

15 A.   Yes.

16 Q.   And were other items collected as evidence in this

17 investigation from that location?

18 A.   Yes.

19 Q.   I'm going to show you what's been marked for

20 identification as 1J.  Do you recognize what's depicted in that

21 exhibit?

22 A.   Yes.

23 Q.   What's depicted in that exhibit?

24 A.   All the drug evidence and related materials recovered from

25 43 Ruspin in the lower apartment, which include a large amount

1   of U.S. currency, in excess of $56,000.

2       Also to the far left there's a sweatshirt.  On top of that

3   sweatshirt is a quantity of cocaine and ecstasy that were

4   recovered from the black Jeep that was located in the driveway

5   at 43 Ruspin.

6   Q.   Does Government Exhibit 1J fairly and accurately depict

7   the evidence as it was collected on November 16th, 2011, from

8   both the Jeep in the driveway as well as 43 Ruspin?

9   A.   Yes.

10       MS. MARANGOLA:  I'll offer Government Exhibit 1J into

11  evidence at this time.

12       MR. PENDERGRASS:  No objection, Your Honor.

13       THE COURT:  All right.  It will be received.

14       (The following was received in Evidence:

15       Government's Exhibit 1J.)

16  BY MS. MARANGOLA:

17  Q.   Now, Deputy, as you indicate, these were the items that

18  were retrieved from 43 Ruspin; is that correct?

19  A.   Yes.

20  Q.   And you indicated there was -- how much money was seized

21  from that location?

22  A.   Just over $56,000, would have been 56,500 and something.

23  Q.   Can you describe for the jury how that was packaged or

24  where it was located in the residence?

25  A.   It was located in the rear right bedroom in the safe -- in

1  the safe for that -- located in the safe with brick-type

2  object -- objects that were wrapped in tape.

3  Q.   You're saying the money was wrapped in tape?

4  A.   Yes, located in those brick objects were money.

5  Q.   And you indicated that the money was in the safe, correct?

6  A.   That's correct.

7  Q.   Did anyone assist you in opening the safe, presuming it

8  had a combination that was required?

9  A.   Yes.

10  Q.   And who helped you?

11  A.   Myron Johnson helped me open that safe.

12  Q.   To the left of the safe, can you describe what that is?

13  A.   That is a money counter.

14  Q.   Where was that recovered from, if you can recall?

15  A.   I don't recall.

16  Q.   Immediately to the left of the money counter are white

17  substances.  Can you describe for the jury where those were

18  retrieved from?

19  A.   That was the cocaine recovered from the couch located in

20  the front living room just beneath the plastic container.

21  Q.   And right -- and directly to the left of the cocaine

22  recovered from 43 Ruspin, what is that white object?  Can you

23  point to it, too?

24  A.   That is a heat sealer.

25  Q.   And describe what a heat sealer is in reference to a

1  narcotics investigation.

2  A.   Heat sealer is utilized to package cocaine.  Some of the

3  cocaine you see here, this one specifically that I pointed to,

4  the right bag is heat sealed.

5  Q.   And throughout your training and experience as a narcotics

6  officer, have you seen heat sealers in homes that you've

7  searched?

8  A.   Yes.

9       MS. MARANGOLA:  And we'll remove 1J from the screen

10 at this time.

11 BY MS. MARANGOLA:

12 Q.   Did there come a point where you or your colleagues

13 searched the black Jeep which was in the driveway?

14 A.   Yes.

15 Q.   And when did that take place or what was your involvement

16 with respect to that?

17 A.   I did not conduct the search of the Jeep.

18 Q.   Did there come a point where you were directed to view the

19 inside of the Jeep?

20 A.   Yes.

21 Q.   And did one of your partners call you out there to look?

22 A.   Yes.

23 Q.   And at that point were you aware whether or not any

24 contraband was located in the Jeep?

25 A.   Yes.  It was reported to me that a black sweatshirt --

1          MR. PENDERGRASS:  Objection, Your Honor.

2          THE COURT:  Sustained.

3    BY MS. MARANGOLA:

4    Q.   Did you personally see these items, sir?

5    A.   After they were recovered, yes.

6    Q.   I'm going to show you what's been marked for

7    identification as Government Exhibits 1B and 1C and ask if you

8    recognize what's depicted in those photos.  Do you recognize

9    what's shown in those photos?

10   A.   Yes.

11   Q.   And what do you recognize those to be?

12   A.   In 1B depicts a compartment located to the left of the

13   steering wheel.  After that compartment was removed, we

14   recovered a quantity of cocaine, ecstasy, and marijuana.

15   Q.   And does Government Exhibit 1C show or depict how you

16   observed that car once the evidence was located in it?

17   A.   Yes.

18   Q.   And do both of those photos fairly and accurately

19   illustrate the vehicle as you observed it back on November 16th

20   of 2011?

21   A.   Yes.

22         MS. MARANGOLA:  I'll offer Government Exhibit 1B and

23   1C into evidence at this time.

24         MR. PENDERGRASS:  No objection, Your Honor.

25         THE COURT:  All right.  Received.

1          (The following were received in Evidence:

2          Government's Exhibits 1B and 1C.)

3     BY MS. MARANGOLA:

4     Q.   I'm going to show you Government Exhibit 1C.  Can you

5     describe to the jury what's depicted in Government Exhibit 1C?

6     A.   Yes.  It shows the compartment to the left of the steering

7     wheel.  It also shows a black sweatshirt which was located in

8     that compartment.  Secreted in that sweatshirt was a quantity

9     of cocaine, marijuana, and ecstasy you can see.

10    Q.   Can you point to the area of the vehicle where those items

11    were retrieved from?  What is that?

12    A.   It's a factory compartment.  Most vehicles -- SUVs have

13    them.

14    Q.   And --

15          THE COURT:  Where -- the sweatshirt was inside that

16    compartment?

17          THE WITNESS:  Once you removed the compartment, the

18    sweatshirt was located behind that.

19    BY MS. MARANGOLA:

20    Q.   So the sweatshirt came from inside the dashboard; is that

21    your testimony?

22    A.   That's correct.

23    Q.   Along with the controlled substances that are on the front

24    seat; is that correct?

25    A.   That's correct.

Q.   Is this the vehicle that you observed or one of your
colleagues observed Myron Johnson driving that day or walking
out -- excuse me, let me rephrase.

     Is that the vehicle that you observed the defendant
sitting in the passenger seat in when you came to execute the
search warrant?

A.   Yes.

Q.   And you or your colleagues observed Myron Johnson get out
of the driver's seat; is that correct?

A.   That's correct.

Q.   Once you or your colleagues retrieved the items from the
Jeep and the lower apartment at 43 Ruspin, did you have the
opportunity to speak with Myron Johnson?

A.   Yes, I did.

Q.   And where did this conversation take place?

A.   It took place in the rear right bedroom over where the
U.S. currency was located.

Q.   Where was the defendant during this time?

A.   Still in the driveway at 43 Ruspin.

Q.   So the two of them are separated; is that correct?

A.   Yes.

Q.   Did you have the opportunity to speak with Myron Johnson
in private?

A.   Yes, I did.

Q.   And can you describe what, if anything, you said to him?

1  A.    I advised Mr. Johnson that we recovered a large amount of

2  narcotics at his residence.  I also advised him of our ongoing

3  investigation into his boss, Harold Howard, and himself.

4            MR. PENDERGRASS:  Objection, Your Honor.

5            THE COURT:  Sustained.  That will be --

6            MR. PENDERGRASS:  Move to strike.

7            THE COURT:  -- stricken from the record.

8  BY MS. MARANGOLA:

9  Q.    Did you advise Myron Johnson that the defendant was under

10  investigation as well?

11  A.    Yes.

12  Q.    Did you advise Myron Johnson at that time that 93 Elmer

13  was a place of interest in this investigation?

14            MR. PENDERGRASS:  Objection, Your Honor.

15            THE COURT:  Overruled.

16            THE WITNESS:  Yes, I did.

17  BY MS. MARANGOLA:

18  Q.    And once you advised him of the information you had, what,

19  if anything, did he do?

20  A.    Mr. Johnson then --

21            THE COURT:  Don't tell us what he said.  Just tell us

22  what he did --

23            MS. MARANGOLA:  Right.

24            THE COURT:  -- that you observed personally.

25            THE WITNESS:  Mr. Johnson testified in camera in

1   front of a judge.

2   BY MS. MARANGOLA:

3   Q.   And to take it a step back, did you approach Mr. Johnson

4   with the idea of obtaining a search warrant for 93 Elmer

5   Street?

6   A.   Yes.

7   Q.   Did you advise him that you would potentially help him out

8   with his charges if he did that?

9           MR. PENDERGRASS:  Objection, Your Honor.

10          THE COURT:  Sustained.

11  BY MS. MARANGOLA:

12  Q.   Did you provide Myron Johnson with any incentives to do

13  that?

14          MR. PENDERGRASS:  Objection, Your Honor.

15          THE COURT:  Sustained.

16          You had a conversation with Mr. Johnson, okay.  Based

17  on that conversation, you obtained a search warrant; is that

18  right.

19          THE WITNESS:  That's correct.

20          THE COURT:  All right.  Next question, please.

21  BY MS. MARANGOLA:

22  Q.   Did you obtain a search warrant for 93 Elmer Street and

23  the attached garage behind it?

24  A.   Yes.

25  Q.   At this point -- well, strike that.

1    Did there come a point then where you arrived at 93 Elmer

2    Street?

3    A.   Yes.

4    Q.   And that was to execute the search warrant; is that

5    correct?

6    A.   That's correct.

7         MS. MARANGOLA:  Can you -- and to publish to the jury

8    again, please, 16C -- oh, I'm sorry, that's not in evidence,

9    excuse me -- 16B.

10        THE COURT:  16 or -- 16?

11        MS. MARANGOLA:  16B, Your Honor.

12   BY MS. MARANGOLA:

13   Q.   When you returned to the residence, was this the late

14   hours of November 16th into the early morning hours of

15   November 17th?

16        MR. PENDERGRASS:  Objection.

17        THE COURT:  Overruled.

18        THE WITNESS: The residence looked as it is here, and

19   also located in the driveway was the Kia Sportage in which

20   Mr. Howard was observed in the driver's seat earlier that day.

21        MR. PENDERGRASS:  Judge --

22   BY MS. MARANGOLA:

23   Q.   So the Kia Sportage was back?

24        MR. PENDERGRASS:  Objection.

25        THE COURT:  Overruled.  Go ahead.  You may answer.

1    THE WITNESS:  Yes.

2  BY MS. MARANGOLA:

3  Q.   Did there come a point where you and your partners entered

4  that location?

5  A.   Yes.

6  Q.   Now, did you -- were you utilizing any keys to enter that

7  location?

8  A.   Yes.

9  Q.   And are you aware of where the keys you used to enter 93

10  Elmer came from?

11  A.   Mr. Howard's person.

12  Q.   When were they obtained from the defendant's person?

13  A.   While he was located in the driveway at 43 Ruspin.

14  Q.   Sir, I'm going to show you what's been marked for

15  identification as Government Exhibit 3.  Do you recognize

16  Government Exhibit 3?

17  A.   Yes, I do.

18  Q.   How do you recognize Government Exhibit 3?

19  A.   These are the keys that were located on Mr. Howard's

20  person on November 16th, 2011.

21  Q.   On November 16th of 2011, was there an additional key on

22  that key ring?

23  A.   Yes, also on this key ring was a Hummer key.

24  Q.   And it's not on there today; is that correct?

25  A.   No.

1  Q.   Can you tell the jury why it's not on that key ring?

2  A.   This vehicle was ultimately stored at our garage, Erie

3  County Sheriff's garage, and the key was utilized to drive that

4  vehicle from that location to the garage.

5  Q.   On the evening that those keys were retrieved from the

6  defendant's pocket, there was a Hummer key on those; is that

7  correct?

8  A.   Yes.

9  Q.   Other than that, do those keys appear to be in

10 substantially the same condition as they were on November 16,

11 2011?

12 A.   Yes.

13        MS. MARANGOLA:  I'll offer Government Exhibit 3 at

14 this time, Your Honor.

15        MR. PENDERGRASS:  I have no objection, Your Honor.

16        THE COURT:  All right.

17        (The following was received in Evidence:

18        Government's Exhibit 3.)

19 BY MS. MARANGOLA:

20 Q.   Now, you indicated you used the defendant's key --

21        THE COURT:  Just one second.

22 BY MS. MARANGOLA:

23 Q.   -- to enter 93 --

24        THE COURT:  Just one second.

25        MS. MARANGOLA:  I'm sorry, Your Honor.

THE COURT:  All right.  Go ahead.

MS. MARANGOLA:  Thank you, Your Honor.

BY MS. MARANGOLA:

Q.   You utilized the defendant's key to enter the front

residence; is that correct?

A.   That's correct.

Q.   And did you personally go inside 93 Elmer?

A.   Yes, I did.

Q.   Did it appear, based on your observations, that anyone was

living in that location?

A.   No.

Q.   Describe what items were in that house or weren't in that

house that leads you to that conclusion.

A.   There was clothing items located on the floor of the

residence, also a heat sealer was located at the residence.

Q.   Was there any furniture in there that would indicate

somebody was living there?

A.   No.

Q.   Any women's clothing items that were -- that you

personally observed in that location?

A.   I did not observe any women's clothing.

Q.   Was there any decorations hung up as if someone was living

there?

A.   I don't recall.

Q.   But based on your physical observations, it didn't appear

1  someone was living there?

2  A.   That's correct.

3  Q.   Now, does that stockade fence in -- on the right side of

4  16B, did that require a lock and key to get past, or do you

5  recall?

6          THE COURT:  Just a second.  All right.

7          MS. MARANGOLA:  I'll restate the question.

8  BY MS. MARANGOLA:

9  Q.   Do you recall if you needed a key to get past the gate at

10 that point or not?

11 A.   I don't recall.

12 Q.   How did you and your partners make entry into the backyard

13 of that residence?

14 A.   We made entry into the front residence, front door of the

15 residence.  We traveled to the rear of the residence.  There

16 was a door located at the rear which led you into the backyard.

17 Q.   Now, based on what you observed that evening, were there

18 two ways into the backyard, either through the gate or through

19 the back of the house?

20 A.   Yes.

21 Q.   And does that stockade fence that is shown with the gate,

22 does that surround the entire premises?

23 A.   I don't recall.

24 Q.   Okay.  I'm going to show you what's been marked for

25 identification as Government Exhibit 18C and ask if you

1  recognize this.

2  A.   Yes.

3  Q.   And what's depicted in Government Exhibit 18C?

4  A.   It is a picture of the left rear yard of 93 Elmer.  There

5  are dog cages located in the rear yard, and also to the upper

6  right of the picture the garage -- the detached garage is

7  located there.

8  Q.   And does that picture fairly and accurately depict the

9  backyard as you observed it on November 16th, 2011?

10  A.   Yes.

11       MS. MARANGOLA:  I'll offer Government Exhibit 18C

12  into evidence.

13       MR. PENDERGRASS:  No objection, Your Honor.

14       THE COURT:  It will be received.

15       (The following was received in Evidence:

16       Government's Exhibit 18C.)

17  BY MS. MARANGOLA:

18  Q.   Can you describe for the jury what we're looking at in

19  Picture 18C?

20  A.   Here are the dog cages located to the rear left of the

21  backyard at 93 Elmer.  To the upper right is the detached

22  garage of 93 Elmer.

23  Q.   And right to the left of that garage, can you see if

24  there's a fence?

25  A.   No.

1   Q.   You can't tell from that picture?

2   A.   My eyes are bad.

3   Q.   Now, up in the front left corner, you said there were dog

4   cages; is that correct?

5   A.   Yes.

6   Q.   Can you describe how you tried to make entry to the

7   backyard of that location?

8   A.   I exited the rear door of the residence.  Located in the

9   rear yard were two pit bulls that were loose.

10   Q.   Can you describe their demeanor towards you and your

11   partners?

12   A.   One of the pit bulls was very calm, and another pit bull

13   was extremely aggressive.

14   Q.   And what was he doing that -- he or she doing that made

15   you say he was extremely aggressive?

16   A.   The dog approached us, approached our location, growling,

17   showing his teeth, barking.

18   Q.   And was he a large dog or a small dog?

19   A.   Large dog.

20   Q.   At this point did you or one of your fellow officers

21   attempt to subdue the dog?

22   A.   Yes.

23   Q.   And how was that done initially?

24   A.   We utilized pepper spray and sprayed the dog.

25   Q.   Did that deter his aggression at any point?

1   A.    No.

2   Q.    So describe what you and your officers were doing in an

3   attempt to get to the garage.

4   A.    We stayed inside the door at the rear of the residence,

5   and a short time later both dogs went into their respective

6   cages.

7   Q.    And what did you do as soon as the dogs went into their

8   cage?

9   A.    I observed my partner fire a shotgun round into the cages.

10   Q.    And was that in an attempt to subdue the dog?

11   A.    Yes.

12   Q.    Okay.  Could you get to the garage without interacting

13   with the pit bulls?

14   A.    No.

15   Q.    Were the cages -- the cages were opened obviously,

16   correct?

17   A.    Correct.

18   Q.    And whether you entered through the back door of the house

19   or went through the gate, would you have to encounter those pit

20   bulls to get to the garage?

21   A.    Yes.

22   Q.    Once the pit bulls were subdued, did someone close the

23   gate to the pit bull cage?

24   A.    Yes.

25   Q.    And once that was done, did you or your colleagues

1  approach the garage?

2  A.   Yes.

3  Q.   When you approached the garage, did you determine whether

4  that was a locked garage or unlocked?

5  A.   It was a locked garage.

6  Q.   And did you have anything to assist you in making entry to

7  the locked garage?

8  A.   Yes.

9  Q.   And what was that?

10  A.   Mr. Howard's keys.

11  Q.   Were they the same set of keys that I showed you with

12  Government Exhibit 3?

13  A.   Yes.

14  Q.   I'm going to show you what's been marked for

15  identification as Government Exhibit 16D.  Do you recognize

16  what's depicted in that photograph?

17  A.   Yes.

18  Q.   And what is it?

19  A.   It's a picture of the detached garage located at 93 Elmer

20  Street.

21  Q.   Does that picture fairly and accurately depict how the

22  detached garage appeared to you on November 16th, 2011?

23  A.   Yes.

24        MS. MARANGOLA:  I'll offer 16D into evidence at this

25  time and ask that it be published to the jury.

1      MR. PENDERGRASS:  No objection, Your Honor.

2      THE COURT:  All right.  It will be received.

3      (The following was received in Evidence:

4      Government's Exhibit 16D.)

5 BY MS. MARANGOLA:

6 Q.   This is the garage that you searched on that evening; is

7 that correct?

8 A.   That's correct.

9 Q.   And can you tell us what doors or where the locks were on

10 the doors that you earlier described?

11 A.   To the left of the garage there's a black gated door, and

12 on the left-hand side the lock is there along with the knob.

13 Q.   And did you or one of your colleagues in your presence

14 utilize the defendant's key to open that door -- or to unlock

15 that door, I should say?

16 A.   Yes.

17 Q.   Does the garage door itself -- how would you make entry

18 into that location?

19 A.   The garage door itself -- are you talking about the actual

20 entranceway into the garage?

21 Q.   I was talking about the garage door that you would have to

22 lift to drive a car in or out of it.  Well, strike that.

23      Did you make entry through the door on the left?

24 A.   Yes.

25 Q.   And once inside, then did you lift the gate that you would

1   need to to let a car in or out?

2           MR. PENDERGRASS:  Objection, Your Honor.

3           THE COURT:  Pardon me?

4           MR. PENDERGRASS:  Objection.  She's leading.

5           THE COURT:  Sustained.

6   BY MS. MARANGOLA:

7   Q.   Did you open the garage door --

8           THE COURT:  What did you do after you got inside the

9   door?

10          THE WITNESS:  Once we opened the doorway of the

11  garage, we were only able to fit one or two people into the

12  garage, and we opened the larger door.

13  BY MS. MARANGOLA:

14  Q.   From the inside?

15  A.   Yes.

16  Q.   When you say you could only fit one or two people, why is

17  that?

18  A.   Mr. Howard's 2008 Hummer was located in that garage.

19  Q.   Was it a tight fit; is that what you're saying?

20  A.   Very.

21  Q.   And describe for the jury what you mean by that.

22  A.   As it was located in the garage, there was a small amount

23  of lawn equipment located also in the garage.  When you opened

24  the door, I could barely squeeze into the driver's seat of the

25  door.

1   Q.   Ultimately, did you or one of your colleagues drive the

2   Hummer out of that garage?

3   A.   I did.

4   Q.   Was the Hummer backed into that garage or was it -- if you

5   can remember?

6   A.   I don't recall.

7   Q.   Ultimately, you said you pulled the Hummer out of the

8   garage though?

9   A.   Yes.

10  Q.   I'm going to show you what's been marked for

11  identification as Government Exhibit 18A.  If you recognize

12  what's depicted in that photograph, please advise the Court.

13  A.   I do.

14  Q.   What is it?

15  A.   It's a picture of Mr. Howard's 2008 Hummer just after it

16  was driven out of the garage.

17  Q.   And you said that substantially -- excuse me.  That

18  photograph fairly and accurately depicts the Hummer as it

19  appeared when you moved it out of the garage on that date?

20  A.   Yes.

21       MS. MARANGOLA:  I'll offer Government Exhibit 18 and

22  ask that it be published to the jury.

23       MR. PENDERGRASS:  No objection, Your Honor.

24       THE COURT:  All right.  It will be received.

25       (The following was received in Evidence:

```
 1                  Government's Exhibit 18A.)
 2             MR. PENDERGRASS:  That would be 18A, right?
 3             MS. MARANGOLA:  18A.  I'm sorry.
 4    BY MS. MARANGOLA:
 5    Q.   And the Hummer is just being backed out of the garage; is
 6    that correct?
 7    A.   Actually being driven forward out of the garage.
 8    Q.   And is that the same direction it was parked in while it
 9    was in the garage?
10    A.   Yes.
11    Q.   So then in -- with respect to when you entered the garage,
12    was the front of the car facing you?
13    A.   Yes.
14    Q.   So the Hummer was backed into the garage, true?
15    A.   That's correct.
16    Q.   Now, once the Hummer was pulled out of the garage or
17    driven out of the garage by you, what was going on around you
18    at this point?
19    A.   Other law enforcement officers located on the front
20    perimeter of the residence advised that there were numerous
21    individuals gathering at the front.  Also there were vehicles
22    driving by shining flashlights in our officers' faces.
23             THE COURT:  What time is this about, sir?  What time
24    is this about?
25             THE WITNESS:  This is later at night, Judge.
```

```
 1              THE COURT:  Ballpark?
 2              THE WITNESS:  11ish.
 3              THE COURT:  Okay.
 4    BY MS. MARANGOLA:
 5    Q.   Were other civilians coming out in your direction while
 6    you were pulling the vehicle out?
 7              MR. PENDERGRASS:  Objection, Your Honor, 401.
 8              THE COURT:  Overruled.
 9              THE WITNESS:  There were individuals located at the
10    front of the driveway of the sidewalk to the left and to the
11    right.
12    BY MS. MARANGOLA:
13    Q.   And what did you decide to do once these individuals came
14    out?
15    A.   We decided -- I decided for officer safety reasons it
16    would be better if we transported -- if I transported the
17    vehicle from 93 Elmer to our offices located at 45 Elm Street.
18    Q.   And during this time period, did you obtain a search
19    warrant for the Hummer?
20    A.   Yes.
21    Q.   And prior to obtaining the search warrant, did you search
22    that car at all?
23    A.   No.
24    Q.   You indicated you transported that Hummer to what
25    location?
```

1   A.   45 Elm Street, that's where our offices are located.

2   Q.   And is that the place where you began a search of the

3   vehicle?

4   A.   After we obtained the search warrant, we searched the

5   vehicle.

6   Q.   I'm going to show you what's been marked for

7   identification as Government Exhibits 18D and 18E.  Do you

8   recognize what's depicted in those photographs, sir?

9   A.   Yes.

10   Q.   And what's depicted in those photographs?

11   A.   In 18D, to the left there is a plastic storage area

12   located in the rear hatch of Mr. Howard's Hummer.  And in 18E,

13   that's a picture of what the -- of what items were located in

14   the storage area as it was opened.

15   Q.   Do those photographs fairly and accurately depict those

16   areas as you observed them on November 16th, 2011?

17   A.   Yes.

18        MS. MARANGOLA:  I'll offer Government Exhibits 18D

19   and 18E into evidence.

20        MR. PENDERGRASS:  No objection, Your Honor.

21        THE COURT:  They will be received.

22        (The following were received in Evidence:

23        Government's Exhibits 18D and 18E.)

24        MS. MARANGOLA:  I'd like to publish to the jury 18D

25   at this time.

1  BY MS. MARANGOLA:

2  Q.   And what is depicted in 18D, sir?

3  A.   In 18D, the storage area at the rear of Mr. Howard's

4  vehicle.

5  Q.   Can you circle the area that you're describing, because I

6  don't think it's coming through?  What is that?

7  A.   That is the storage compartment located in the rear hatch

8  of Mr. Howard's vehicle.

9  Q.   Now, it appears that there's a top portion of that that's

10  opened slightly; is that accurate?

11  A.   That's accurate.

12  Q.   When you first observed that area prior to searching it,

13  was it opened or closed?

14  A.   That was closed.

15  Q.   So describe at what point in the evening this picture is

16  taken.

17  A.   This is after we had transported -- after I had

18  transported Mr. Howard's vehicle from 93 Elmer Street to 45 Elm

19  Street.

20       MS. MARANGOLA:  I'd like to publish 18E at this time.

21  BY MS. MARANGOLA:

22  Q.   What is depicted in this photograph?

23  A.   It is a picture of the storage compartment as it was

24  opened.

25  Q.   And is that the storage compartment that you circled in

1    the previous photograph?

2    A.    That's correct.

3    Q.    And do these items appear as they did before you searched

4    the vehicle on that evening?

5    A.    Yes.

6    Q.    So what we're seeing in 18E, is that exactly as you

7    observed it when you opened that compartment?

8    A.    Yes.

9    Q.    Describe what the multi-colored object is in the top of

10   that compartment.

11   A.    It's a duffle bag.

12   Q.    Did you have the opportunity to remove the duffle bag from

13   that container and go through it to observe its contents?

14   A.    Yes.

15   Q.    I'm going to show you what's been marked for

16   identification as Government Exhibits 41 and 42.  Do you

17   recognize Items 41 and 42?

18   A.    Yes.

19   Q.    Describe for the jury what Item Number 41 is.

20   A.    Item 41 is the duffle bag that's located in Picture 18.

21   Q.    And is that bag in substantially the same condition as

22   when you observed it back on that date?

23   A.    Yes.

24         MS. MARANGOLA:  I'll offer Government Exhibit 41 into

25   evidence at this time.

MR. PENDERGRASS:  No objection.

THE COURT:  All right.  It will be received.

(The following was received in Evidence:

Government's Exhibit 41.)

BY MS. MARANGOLA:

Q.   Now, did you have the opportunity to go through that duffle bag while you were searching the vehicle?

A.   Yes.

Q.   And were you aware what was located inside that duffle bag?

A.   Yes.

Q.   I'm going to show you -- or ask you to go through the contents of Government Exhibit 41, and I'm going to ask you if you recognize the items that were located in that plastic container.

A.   Yes, I do.

Q.   Now, prior to coming to court, you've had the opportunity to go through that bag; is that correct?

A.   That's correct.

Q.   And in reviewing the contents of that bag, do all the items appear to be in substantially the same condition as when you observed them and collected them back on November 16th, 2011?

A.   Yes.

MS. MARANGOLA:  I'll offer the contents of Government

1    Exhibit 41 at this time as well.

2           MR. PENDERGRASS:  Your Honor, I don't know what those

3    contents are.  May I --

4           THE COURT:  We'll take our luncheon break, ladies and

5    gentlemen, at this time.  We'll return -- because we're going

6    to leave a little early today, so give you an hour for lunch.

7    1:30 we'll return.

8           Please during the recess do not discuss the case and

9    do not discuss it among yourselves.

10          Take a look at it.  The Court will be in recess.

11          (A recess was taken at 12:34 p.m.)

12

13          (Jury present in the courtroom at 1:33 p.m.)

14          THE COURT:  Okay.  Good afternoon, everyone.

15          JURORS:  Good afternoon.

16          THE COURT:  All right.  Ms. Marangola.

17          MS. MARANGOLA:  Good afternoon, Your Honor.

18    BY MS. MARANGOLA:

19    Q.   I believe when we left off 18E was up for the jury.

20          MS. PRAWEL:  I'm sorry.

21          MS. MARANGOLA:  E.

22          MR. PENDERGRASS:  I believe when we left off, you

23    were trying to enter that into evidence.

24          MS. MARANGOLA:  42 is in evidence -- excuse me.  41

25    was in evidence, and I was entering 42 into evidence.

1          MR. PENDERGRASS:  I have no objection.

2          THE COURT:  All right.  It will be received.

3          (The following was received in Evidence:

4          Government's Exhibit 42.)

5          MS. MARANGOLA:  Would you please publish 18E to the

6     jury.  Thank you.

7     BY MS. MARANGOLA:

8     Q.   Now, Deputy, earlier you were testifying that you had the

9     opportunity to go through the contents of Exhibit 41; is that

10    correct?

11    A.   That's correct.

12    Q.   And are you familiar with what items you located inside?

13    A.   Yes.

14    Q.   I'm going to show you what's been received in evidence at

15    this point as Government Exhibit 42.  At this time I'm going to

16    ask you to empty the contents of Government Exhibit 42 and

17    describe for the jurors -- Deputy, did you locate any gloves in

18    Government Exhibit 41?

19    A.   Yes.

20          THE COURT:  Hang on a second.

21    BY MS. MARANGOLA:

22    Q.   Can you describe for the jury, please, what, if any,

23    gloves you located inside Government Exhibit 41.

24    A.   Yes, located a Mr. Clean bag containing disposable latex

25    gloves and also a leather glove.

1  Q.  One leather glove?

2  A.  Yes, one leather glove.

3  Q.  And how many gloves did that plastic container hold?  Does

4  it say on the outside?

5  A.  Ten.

6  Q.  And there were various pairs of latex gloves in there; is

7  that what you're touching?

8  A.  Yes, there was --

9  Q.  Were there any other items located in that bag?

10  A.  Yes, there's a black muscle shirt, a plastic container,

11  this holds ammunition, generally goes in a box, and there were

12  two brushes typically used to clean guns.

13  Q.  Could you place all those items back in Exhibit 42,

14  please.  Thank you.

15      I'm going to approach and show you what's been marked as

16  Government Exhibits 29 and 30.  Do you recognize Government

17  Exhibit 29 and 30?

18  A.  Yes, they're boxes which contain ammunition.

19  Q.  And are you aware from where those came from?

20  A.  They were also located in the bag.

21  Q.  In Government Exhibit 41?

22  A.  Yes.

23  Q.  And do those items appear to be in substantially the same

24  condition as when you observed them in Government Exhibit 41

25  and collected them?

A.   Yes.

          MS. MARANGOLA:  I'll offer Government Exhibit 41 and 42 into evidence at this time -- excuse me -- 29 and 30 into evidence at this time.

          MR. PENDERGRASS:  No objection.

          THE COURT:  All right.  They'll be received.

          (The following were received in Evidence:

          Government's Exhibit 29 and 30.)

BY MS. MARANGOLA:

Q.   Deputy, were there other items that were also located in Government Exhibit 41?

A.   Yes.

Q.   And what do those items entail?

A.   We found other rounds of ammunition.  We also found some weapons.

Q.   I'm going to show you what's been marked for evidence as Government Exhibit 31 and 34.  And do you recognize those items and where they were recovered from?

A.   Yes.  Item 31 contains 2540 Smith and Wesson cartridges, and Item 43 -- or 34 contains an empty AK47 magazine holder.

Q.   And did you collect those items?

A.   Yes.

Q.   And where did you collect those items from?

A.   The rear of Mr. Howard's Hummer.

Q.   Were they also in that bag?

1   A.   Yes.

2   Q.   And do they appear to be in substantially the same

3   condition as when you collected them on November 61th, 2011?

4   A.   Yes.

5        MS. MARANGOLA:  I'll offer Government Exhibit 31 and

6   34 into evidence at this time.

7        MR. PENDERGRASS:  No objection, Your Honor.

8        THE COURT:  All right.  They'll be received.

9        (The following were received in Evidence:

10       Government's Exhibit 31 and 34.)

11  BY MS. MARANGOLA:

12  Q.   Government Exhibit 29 and 30, I don't know if you

13  described what they were to the jury.  If not, can you please

14  do so at this time.

15  A.   Item 29, Exhibit 29 is a box of Remington 38-caliber

16  bullets and Item 30 is a box of PMC nine-millimeter bullets.

17  Q.   Now, a moment ago you also indicated you found firearms in

18  that bag; is that correct?

19  A.   That's correct.

20  Q.   And how many firearms did you find in that bag?

21  A.   Three.

22  Q.   Deputy, I'm going to show you what's been marked for

23  identification as Government Exhibit 27, 28, and 28A and ask if

24  you recognize these items.

25       Starting with Government Exhibit 27, what do you recognize

1    that to be?

2    A.    27 is a Haskell Model JS 45-caliber handgun bearing Serial

3    Number 007819.  This was located in the bag in the rear of

4    Mr. Howard's vehicle.

5    Q.    Did you personally retrieve that firearm from the bag

6    located in the back of Mr. Howard's vehicle?

7    A.    Yes.

8    Q.    And did you say that firearm appears to be in the same

9    substantial condition as when you collected it on

10   November 16th, 2011?

11   A.    Yes.

12            MS. MARANGOLA:  I'll offer Government Exhibit 27 into

13   evidence at this time.

14            MR. PENDERGRASS:  No objection, Your Honor.

15            THE COURT:  All right.  It will be received.

16            (The following was received in Evidence:

17            Government's Exhibit 27.)

18   BY MS. MARANGOLA:

19   Q.    When you retrieved the firearm out of the bag depicted in

20   Government Exhibit 18E, did you determine whether or not that

21   firearm was loaded?

22   A.    Yes, it was.

23   Q.    And what are you holding that's Government Exhibit 28?

24   A.    Exhibit 28 is a magazine which was removed from the

25   45-caliber handgun.

Q.   And what is Government Exhibit 28A?

A.   28A is the ammunition which was removed from the magazine.

Q.   And do you know how many rounds are in Government Exhibit 28A by chance?

A.   No, I don't.

Q.   Did you or one of your colleagues take the magazine from the firearm and make it safe?

A.   Yes.

Q.   And was that done in your presence or did you do it yourself?

A.   In my presence.

Q.   And you observed Government Exhibit 28 and 28A removed from that firearm; is that correct?

A.   That's correct.

Q.   Do those items appear to be in substantially the same condition as when you observed this occur back on November 16th of 2011?

A.   Yes.

           MS. MARANGOLA:  I'll offer Government Exhibit 28 and 28A at this time.

           MR. PENDERGRASS:  No objection.

           THE COURT:  All right.  It will be received.

           (The following were received in Evidence:

           Government's Exhibits 28 and 28A.)

BY MS. MARANGOLA:

Q.   Now, Deputy, you indicated you found you two additional

guns hidden within that bag; is that correct?

A.   That's correct.

Q.   Deputy, I'm going to show you what's been marked for

identification as Government Exhibit 25 and Government

Exhibit 26 and ask if you recognize these items.

A.   Yes.

Q.   And what do you recognize those items to be?

A.   Item 25 is an Amadeo Rossi 38-caliber handgun revolver

which was recovered in the rear of Mr. Mr. Howard's vehicle in

the bag.

Q.   And, again, did you personally observe that firearm in the

back of the defendant's vehicle?

A.   Yes.

Q.   Does that firearm appear to be in substantially the same

condition as when you retrieved it from the bag in the back of

the Hummer on that date?

A.   Yes.

Q.   And Item 26, what is that?

A.   These are the rounds which were located in the revolver.

Q.   And, again, did you or somebody in your presence empty the

revolver rounds that are now marked as Government Exhibit 26

from that firearm?

A.   Someone else in my presence.

Q.   Removed those?

1    A.    Yes.

2    Q.    Do you know how many rounds that firearm would hold?

3    A.    Five.

4    Q.    Do you know how many rounds were taken from the gun?

5    A.    Five.

6    Q.    And does Government Exhibit 26, do those items appear in

7    substantially the same condition as when you observed them

8    being removed from the firearm back on November 16th, 2011?

9    A.    Yes.

10            MS. MARANGOLA:  I'll offer Government Exhibits 25 and

11   26 into evidence at this time.

12            MR. PENDERGRASS:  No objection, Your Honor.

13            THE COURT:  All right.  They'll be received.

14            (The following were received in Evidence:

15            Government's Exhibits 25 and 26.)

16   BY MS. MARANGOLA:

17   Q.    And now, Deputy, you indicate that there was a third

18   firearm that was located in the back of the Hummer in that bag;

19   is that correct?

20   A.    That's correct.

21   Q.    Now, I'm going to show you what's been marked as

22   Government Exhibit 20 and Government Exhibit 21.  Do you

23   recognize what Government Exhibit 20 is?

24   A.    Yes.

25   Q.    And can you describe for the jury what Government

1    Exhibit 20 is?

2    A.    It's a nine-millimeter fully automatic gun which was

3    recovered in the rear of the Hummer of Mr. Howard's vehicle.

4    Q.    Now, does that fully automatic gun have a general term

5    that's used to describe it on the street?

6    A.    Machine gun.

7    Q.    And is that -- you -- excuse me.

8         You recovered that from the bag that was in the back of

9    the defendant's Hummer, Government Exhibit 41; is that correct?

10   A.    That's correct.

11   Q.    And does that firearm appear to be in substantially the

12   same condition as when you observed it back on that date?

13   A.    It does, but it was wrapped in plastic.

14   Q.    And can you describe that for the jury?  When you removed

15   that gun from the bag, describe how it was packaged.

16   A.    It was completely covered in plastic.  You could tell it

17   was a firearm, but you couldn't tell what kind.

18   Q.    At this point I'm going to show you what's been marked for

19   identification as Government Exhibit 18G.  Do you recognize

20   what's depicted in that photograph?

21   A.    Yes.

22   Q.    And what is it?

23   A.    It's a -- this -- this gun here wrapped up in plastic.

24   Q.    And is that how you observed it back on November 16th,

25   2011, as you just described?

```
 1   A.   Yes.
 2   Q.   Does that photograph fairly and accurately depict the
 3   items that are shown in the photo as you observed them back on
 4   that date?
 5   A.   Yes.
 6        MS. MARANGOLA:  I'll offer Government Exhibit 18G at
 7   this time and ask that it be published to the jury.
 8        MR. PENDERGRASS:  No objection.
 9        THE COURT:  It will be received.
10        (The following was received in Evidence:
11        Government's Exhibit 18G.)
12   BY MS. MARANGOLA:
13   Q.   Now, I want to direct your attention to the right-hand
14   portion of the photograph, the second item from the right.  Can
15   you describe what we're looking at in this photograph?
16   A.   Yes, this item to the right is this nine-millimeter
17   magazine wrapped in plastic as the gun is.
18   Q.   And what you're holding up in your hand right now is
19   Government Exhibit 26; is that correct?  It should have the
20   sticker, yellow.
21   A.   Yeah, 21.
22   Q.   21 -- oh, I'm sorry, Government Exhibit 21.
23        And can you describe for the jury what Government
24   Exhibit 21 actually is?
25   A.   It's a magazine holder for nine-millimeter bullets which
```

1  would be utilized in this gun here.

2  Q.  Now, you indicated that the magazine as well was wrapped

3  in plastic; is that accurate?

4  A.  Yes.

5  Q.  Did you ever unwrap either Government Exhibit 20, the

6  machine gun, or the magazine that accompanies it from the

7  plastic wrap?

8  A.  No.

9  Q.  You didn't.  I know that 21 was wrapped in plastic wrap,

10  but does it appear to be in substantially the same condition as

11  when you observed it aside from the plastic wrap missing?

12  A.  Yes.

13          MS. MARANGOLA:  Okay.  I'll offer Government

14  Exhibit 21 into evidence at this time.

15          MR. PENDERGRASS:  No objection, Your Honor.

16          THE COURT:  All right.

17          (The following was received in Evidence:

18          Government's Exhibit 21.)

19  BY MS. MARANGOLA:

20  Q.  When you removed the magazine from the bag in the back of

21  the Hummer, did it appear by its weight that it contained

22  ammunition in it?

23  A.  Yes.

24  Q.  And, again, you didn't unwrap it, so you can't say for

25  certain; is that fair?

1  A.   That's fair.

2  Q.   Are you familiar with reviewing that item how many rounds

3  that machine gun would hold, the magazine for the machine gun

4  would hold?

5  A.   I don't recall.  I don't know.

6        MS. MARANGOLA:  Can you un-zoom the picture?

7        Actually, I'm sorry.  Can you put 18E up again for

8  the jury.

9  BY MS. MARANGOLA:

10 Q.   Now, in addition to the firearms and the ammunition that

11 you just described, were any other items of contraband located

12 in this compartment depicted in 18E?

13 A.   Yes.

14 Q.   And what did you recover?

15 A.   We recovered -- I recovered three kilograms of cocaine.

16        MS. MARANGOLA:  And can 18G be published to the jury

17 again, please.

18 BY MS. MARANGOLA:

19 Q.   Can you describe the three items in the left portion of

20 this photograph for the jury?

21 A.   Yeah, all three items, brick-like items contain cocaine.

22 Q.   And they appear to be black and gray; is that accurate?

23 A.   Yes.

24 Q.   And can you describe to the jury what they were wrapped in

25 to make them black and gray?

1   A.   It was wrapped in electrical tape.

2   Q.   Did there come a point where you or one of your colleagues

3   unwrapped those items?

4   A.   Yes.

5   Q.   And what was the purpose of that?

6   A.   To see the contents.

7   Q.   I'm going to show you what's been marked for

8   identification as Number 18H and ask you if you recognize this.

9   A.   Yes, I do.

10  Q.   And what do you recognize that photograph to entail?

11  A.   It shows the machine gun magazine wrapped in plastic, the

12  three kilograms of cocaine.  It's a little blurry at the top.

13  I can't see what that is.  And then at the bottom it's the tape

14  that was around the packages.

15  Q.   And does that photograph fairly and accurately depict the

16  item you retrieved from the defendant's vehicle after the kilos

17  of cocaine were unwrapped with the duct tape?

18  A.   Yes.

19       MS. MARANGOLA:  I'll offer 18G into evidence at this

20  time -- oh, 18H, excuse me.

21       MR. PENDERGRASS:  No objection.

22       THE COURT:  All right.

23       (The following was received in Evidence:

24       Government's Exhibit 18H.)

25  BY MS. MARANGOLA:

1    Q.   Deputy, I'm not sure that I asked you, and if I haven't,

2    does this Government Exhibit 20, does it appear to be in

3    substantially the same condition as when you collected it,

4    aside from the plastic wrap, from the defendant's Hummer back

5    on November 16th, 2011?

6            MR. PENDERGRASS:  Objection, Your Honor.  The item is

7    already in evidence.

8            MS. MARANGOLA:  I don't think it was officially moved

9    in.

10           MR. PENDERGRASS:  Okay.  I'm sorry.

11           MS. MARANGOLA:  So no objection.

12           THE COURT:  Wait a second.

13           MR. PENDERGRASS:  I withdraw my objection, Your

14   Honor.

15           THE COURT:  All right.

16   BY MS. MARANGOLA:

17   Q.   Directing your attention then to 18H, can you describe

18   just briefly again for the jury what's depicted in that

19   photograph and where that's taken?

20   A.   That was taken at 45 Elm Street at our office located

21   here.  At the mid top three -- there's three kilograms of

22   cocaine that were previously wrapped in tape and the magazine

23   wrapped in tape, also the machine gun wrapped in tape, and then

24   at the very bottom is the tape that was on the kilograms.

25   Q.   Now, the kilos in this photograph are wrapped in plastic;

1   is that correct?

2   A.   That's correct.

3   Q.   And when you removed the duct tape, was the plastic around

4   the kilos as well or did you put that on there?

5   A.   Those are --

6        MR. PENDERGRASS:  Objection, Your Honor.  Foundation

7   for duct tape.

8        THE COURT:  Overruled.

9   BY MS. MARANGOLA:

10  Q.   Okay.  So there was plastic on the kilos when you removed

11  the tape, correct?

12  A.   Correct.

13  Q.   Okay.  There also appears to be paperwork in 18H.  Can you

14  just describe -- did you see what that is?

15  A.   The first little piece there is the registration for

16  Mr. Howard's vehicle.  Just below that is the insurance card

17  for Mr. Howard's vehicle.

18  Q.   Were those items retrieved from the 2008 Hummer during the

19  search?

20  A.   Yes.

21  Q.   And did you find those or did one of your colleagues find

22  those?

23  A.   A colleague of mine.

24  Q.   Okay.  Were these items then taken to the Central Police

25  Services lab for testing?

```
1    A.    Yes.

2    Q.    And did you do that or did one of your colleagues do that?

3    A.    One of my colleagues did that.

4    Q.    Did you have the opportunity to search the Kia Sportage as

5    well that evening?

6    A.    Yes.

7    Q.    And was any contraband located in that?

8    A.    No.

9    Q.    Did you have any further action with respect to this

10   investigation on that evening?

11   A.    No.

12          MS. MARANGOLA:  If I may just have a moment, Your

13   Honor.

14          And, Your Honor, for the record, is 20 in evidence at

15   this point?  I moved it in evidence, and I don't know.

16          THE COURT:  I believe 20 is in evidence.  I believe

17   it is.

18          MR. PENDERGRASS:  I believe it was in evidence also,

19   Your Honor.  I didn't check.

20          MS. MARANGOLA:  So there's no objection to it being

21   moved in?

22          MR. PENDERGRASS:  No.

23          MS. MARANGOLA:  Thank you.

24          (The following was received in Evidence:

25          Government's Exhibit 20.)
```

1          MS. MARANGOLA:  I have no further questions for this

2    witness, Your Honor.

3          MR. PENDERGRASS:  May I, Your Honor?

4          THE COURT:  Yes, you may.

5

6                    CROSS EXAMINATION

7

8    BY MR. PENDERGRASS:

9    Q.   Good afternoon, Detective Granville.

10   A.   Good afternoon.

11   Q.   How are you?

12   A.   Good.  How are you?

13   Q.   Doing well.  Thank you.

14        I believe you said that you started an investigation in

15   March of 2010?

16   A.   Yes.

17   Q.   Relative to Mr. Harold Howard?

18   A.   That's correct.

19   Q.   Okay.  And in that investigation that you -- there are

20   some investigatory tools that you use in order to investigate

21   people, correct?

22   A.   Yes.

23   Q.   Some of these investigatory tools are taking pictures of

24   people where they were located, right?

25   A.   That's correct.

1   Q.   Some of these investigatory tools are taking notes about

2   the investigation, correct?

3   A.   That's correct.

4   Q.   Do you have any notes relative to the investigation?

5   A.   No, I do not.

6   Q.   Because you didn't take any notes relative to your

7   investigation of Harold Howard, right?

8   A.   That's correct.

9   Q.   Are there any pictures of Mr. Howard moving from location

10  to location?

11  A.   No, sir.

12  Q.   Are there any records of Mr. Howard driving from Atlanta

13  to Buffalo?

14  A.   Yes.

15  Q.   Okay.  And where are those records located?

16  A.   Those records were utilized in Mr. Howard's state trial.

17  Q.   Okay.  Do you have records of Mr. Howard driving from

18  Buffalo to Atlanta or Atlanta to Buffalo?

19  A.   I do not have the records.

20  Q.   Okay.  That's because there are no records, right?

21  A.   Yes, there is.

22  Q.   Okay.  Did you bring those records with you today?

23  A.   No, I did not.

24  Q.   In fact, I asked for you to turn over any records or notes

25  relative to the investigate --

```
 1            MS. MARANGOLA:  Objection, Your Honor.
 2            THE COURT:  How does he know that?  Sustained.
 3    BY MR. PENDERGRASS:
 4    Q.   Did you turn over any notes to the prosecutor relative to
 5    the -- to the investigation that you were conducting of
 6    Mr. Howard from March 2010, to the present?
 7    A.   No.
 8    Q.   Okay.  So you didn't turn over notes to the prosecutor
 9    relative to Mr. Howard going back and forth to Atlanta?
10    A.   No.  Those were rental car receipts that were utilized in
11    the state case that I was made aware of.
12    Q.   You didn't turn over any notes, right?
13    A.   That's correct.
14    Q.   And, in fact, you weren't even involved in the state case,
15    right?
16    A.   No.
17    Q.   Okay.  So you don't have any notes relative to your
18    investigation of Mr. Howard, right?
19    A.   That's correct.
20    Q.   Okay.  Now, do you have any notes relative to Mr. Howard
21    flying back and forth from Atlanta to Buffalo?
22    A.   I do not, no.
23    Q.   Okay.  I think you were asked some questions about
24    Mr. Howard's movements.  Do you have any notes for this jury
25    relative to Mr. Howard's movements between March of 2010, to
```

1  November 16, 2011?

2  A.   No, I do not.

3  Q.   In fact, I think you testified that you had never seen

4  Mr. Howard at 43 Ruspin, correct?

5  A.   That's correct.

6  Q.   And, in fact, I believe you testified that 43 Ruspin was

7  under your observation between March of 2010, and November of

8  2011?

9  A.   Yes, it would have been closer to 2011, than '10.

10  Q.   Okay.  But you never saw Mr. Howard go in 43 Ruspin?

11  A.   No.

12  Q.   Okay.  Now, and you certainly don't have any notes about

13  Mr. Howard going into 43 Ruspin, right?

14  A.   Correct.

15  Q.   Okay.  Now, on November 16th, 2011, you drafted an -- a

16  search warrant, right, for 43 Ruspin?

17  A.   That's correct.

18  Q.   All right.  And in that search warrant, I think you told

19  the judge in your affidavit -- I think you told the judge that

20  you got information from a confidential informant in September

21  of 2010.  Do you recall that?

22  A.   I'd have to look at the affidavit.

23  Q.   Just from memory, do you recall whether or not you told

24  the judge that you got the information that you received was

25  from a confidential informant in September or -- of 2010?

1          MS. MARANGOLA:  Objection, Your Honor.  He said he

2     didn't know.

3          THE COURT:  Well, it will be up to the jury to

4     recall.

5          THE WITNESS:  Can you repeat?

6     BY MR. PENDERGRASS:

7     Q.   Just -- do you recall that you, in fact, informed the

8     judge that the information that you received was from a

9     reliable confidential informant, that you got that information

10    in September of 2010?

11    A.   I do not recall.

12    Q.   Okay.  Now, and you spent some time with Ms. Marangola on

13    travel patterns of the defendant.  What were the travel

14    patterns of the defendant?

15    A.   That the defendant was traveling to and from Atlanta to

16    Buffalo.

17    Q.   Okay.  None of which you observed?

18    A.   No.

19    Q.   Never -- in fact, did you -- did you jump on a plane to go

20    down to Atlanta any time to follow the defendant down to

21    Atlanta?

22    A.   No.

23    Q.   In fact, I believe you testified that the defendant had a

24    fiancée?

25    A.   That's correct.

1    Q.   And I believe you testified that the fiancée lived in

2    Atlanta, Georgia?

3    A.   Yes.

4    Q.   Okay.  And do people who have significant others in

5    different location travel to see these significant others?

6          MS. MARANGOLA:  Objection, Your Honor.

7          THE COURT:  Sustained.

8    BY MR. PENDERGRASS:

9    Q.   Well, Mr. Howard going to Atlanta to see his fiancée

10   wasn't indicative of drug trafficking, right?

11         MS. MARANGOLA:  Objection, Your Honor.

12         THE COURT:  Assumes a fact not in evidence.

13   Sustained.

14         MR. PENDERGRASS:  Okay.

15   BY MR. PENDERGRASS:

16   Q.   You testified that Mr. Howard went to Atlanta, correct?

17   A.   That's correct.

18   Q.   All right.  What did he do when he was in Atlanta?

19   A.   I don't know.

20   Q.   Okay.  Because you weren't there to observe what he did,

21   right?

22   A.   That's correct.

23   Q.   Okay.  Do you know how Mr. Howard traveled to Atlanta?

24   A.   I knew that he traveled by car and by plane.

25   Q.   Okay.  And, by the way, did you determine whether or not

1    in October of 2011, or on or about October, 31st of 2011, that

2    Mr. Howard had indeed traveled to Atlanta?

3    A.    No.

4    Q.    Okay.  Did you determine in or about November of 2011,

5    whether or not Mr. Howard traveled back from Atlanta by way of

6    airline?

7    A.    I don't recall.

8    Q.    Do you recall whether or not you had any surveillance --

9    and I think that your testimony is that Mr. Howard was some

10   kind of leader of a drug ring, right?

11   A.    Yes.

12   Q.    Okay.  Did you -- did you determine where Mr. Howard was

13   between October 31st and November 10th of 2011?

14   A.    No, sir.

15   Q.    Did you have any eyes on Mr. Howard during that time?

16   A.    No, sir.

17   Q.    Did you follow Mr. Howard down to Atlanta, Georgia during

18   that time?

19   A.    No.

20   Q.    I think the -- when you saw Mr. Howard, you saw Mr. Howard

21   I think you said sitting in the vehicle at 93 Elmer on the 16th

22   of November, 2011, correct?

23   A.    That's correct.

24   Q.    All right.  Between October 31st and the 16th of November,

25   2011, how often did you see Mr. Howard at 93 Elmer?

1  A.   I did not see him, period.

2  Q.   You were investigating Mr. Howard, right?

3  A.   Yes.

4  Q.   For being a drug kingpin in this area, right?

5  A.   That's correct.

6  Q.   And you were -- you expected that he was moving drugs from

7  Atlanta to Buffalo, New York, right?

8  A.   That's correct.

9  Q.   Yet, during that period of time, you don't even know where

10  Mr. Howard was from October 31st until November 16th, correct?

11  A.   That's correct.

12  Q.   All right.  How about in August through October 31st of

13  2011, how many times did you see Mr. Howard at 93 Elmer?

14  A.   I can't recall.

15  Q.   In fact, do you recall whether or not there was any

16  construction work going on at 93 Elmer?

17  A.   From August --

18  Q.   To October 31st, 2011.

19  A.   I do not recall.

20  Q.   Okay.  Do you recall whether anybody was going in and out

21  of 93 Elmer during that time?

22  A.   I don't recall.

23  Q.   Do you recall seeing Mr. Howard going in and out of 93

24  Elmer during that time?

25  A.   I don't recall.

1   Q.   How about July of 2011, how many times did you see

2 Mr. Howard going in and out of 93 Elmer?

3   A.   I don't recall.

4   Q.   In fact, you never saw Mr. Howard -- and I think I

5 listened to your testimony carefully.  You never saw Mr. Howard

6 go in or out of 93 Elmer, correct?

7   A.   That's correct.

8   Q.   You never saw Mr. Howard go in or out of 43 Ruspin,

9 correct?

10   A.   That's correct.

11   Q.   Now, I believe you said in or about March of 2010, you saw

12 someone operating the 2008 -- I mean -- 2008 Hummer?

13   A.   It was after March of 2010, after I receiving the

14 information, I received the information.

15   Q.   Okay.  When after March of 2010?

16   A.   I do not recall.

17   Q.   You never saw Mr. Howard operating the 2008 Hummer,

18 correct?

19   A.   Correct.  I recall location.  I don't recall the time

20 frame.

21   Q.   Okay.  But you never saw him operating that vehicle,

22 correct?

23   A.   Correct.

24   Q.   All right.  And, in fact, I believe you said that you saw

25 Paula Cruz operating the vehicle, correct?

1    A.    That's correct.

2    Q.    And you said that was some time after March of 2010?

3    A.    That's correct.

4    Q.    All right.  Now, and I believe you said you saw that

5    vehicle, I believe, at -- when Paula Cruz was operating that

6    vehicle, it was -- she was operating that vehicle at 93 Elmer?

7    A.    No, I did not say that.

8    Q.    Okay.  Where did you see her operating that vehicle?

9    A.    Turning on to Bailey from South Park in the City of

10   Buffalo.

11   Q.    So you never even seen Paula Cruz operate that vehicle at

12   93 Elmer?

13   A.    That's correct.

14   Q.    Okay.  In fact, do you recall when that vehicle ended up

15   at 93 Elmer?

16   A.    No.  It was in a garage.

17   Q.    Okay.  Did you do -- I -- my question is based on the fact

18   that you had surveillance on Mr. Howard from about March of

19   2010, until November of 2011, right?

20   A.    That's correct.

21   Q.    And in your surveillance of Mr. Howard during that time,

22   how many times did you see him operate the 2008 Hummer?

23          MS. MARANGOLA:  Objection, Your Honor.  Asked and

24   answered.

25          THE COURT:  Overruled.

```
 1              THE WITNESS:  I did not.
 2   BY MR. PENDERGRASS:
 3   Q.   You never saw him operate that Hummer and you never -- and
 4   you don't know when that Hummer ended up at 93 Elmer, right?
 5   A.   That's correct.
 6   Q.   All right.  Now, you are -- I think you testified that the
 7   Hummer was located at 43 Ruspin, correct?
 8   A.   That's correct.
 9   Q.   All right.  And 43 Ruspin was where Myron Johnson lived,
10   correct?
11   A.   Correct.
12   Q.   And at the time that the Hummer was located at 43 Ruspin,
13   was it parked there for some time?
14   A.   Yes, when I observed the Hummer located at 43 Ruspin, it
15   was parked in the rear yard.
16   Q.   All right.  And had it been parked in the rear yard for
17   some time?
18   A.   I don't recall.
19   Q.   Well, did you take any notes about -- and I think you said
20   that the fact that the Hummer was at 43 Ruspin connected some
21   dots for you, right?
22   A.   That's correct.
23   Q.   All right.  In connecting those dots, did you take any
24   notes about how long the Hummer had, in fact, been parked at 43
25   Ruspin?
```

A.    No, sir.

Q.    Okay.  Do you recall about when you observed the Hummer

marked at 43 Ruspin?

A.    It have been in the months leading up to November 16th,

2011.

Q.    Okay.  And do you recall around about what month?

A.    No, sir.

Q.    Okay.  And do you recall about how often during your

surveillance, during the month leading up to November of 2011,

that you observed the 2008 Hummer at 43 Ruspin?

A.    I observed it there a couple of times.

Q.    Okay.  And was it generally parked in the same area as you

had observed it on the first time you were there?

A.    Yes, sir.

Q.    Okay.  So Mr. -- so Mr. Howard's vehicle was simply parked

at 43 Ruspin during -- and you observed that during your --

your investigation?

A.    Yes.  The only time I observed the Hummer at 43 Ruspin it

was parked.

Q.    Okay.  And you never saw Mr. Howard go in and out of the

Hummer while it was parked at 43 Ruspin, correct?

A.    That's correct.

Q.    In fact, you never saw Mr. Howard at 43 Ruspin, right?

A.    That's correct.

Q.    Okay.  Now, you talked about November 16th of 2011, and

1  you talked about seeing a black Jeep departing from 43 Ruspin.

2  Do you recall that?

3  A.   Yes.

4  Q.   Okay.  And I think you -- you said that once you saw the

5  black Jeep departing from 43 Ruspin, that connected the dots

6  for you?

7  A.   No, I did not say that.

8  Q.   You didn't say that the black Jeep connected the dots?

9  A.   No.  I said that observing the Hummer at both 93 Elmer and

10 at 43 Ruspin connected the dots.

11 Q.   Now, the black Jeep, that vehicle had tinted windows on

12 it?

13 A.   Yes.

14 Q.   And the tint was dark enough that you couldn't see inside

15 the vehicle, correct?

16 A.   At nighttime, yes.

17 Q.   All right.  And it was -- it was dark outside when you

18 first encountered the Jeep, right?

19 A.   That's correct.

20 Q.   And when the Jeep pulled up, you were already in the

21 process of serving your warrant on 43 Ruspin upper, correct?

22 A.   After the Jeep circled the block and reentered the

23 driveway at 43 Ruspin, we then proceeded to execute our

24 warrant.

25 Q.   Okay.  Myron Johnson was the driver of the Jeep?

A.   That's correct.

Q.   And so you begin to execute your warrant after Myron
Johnson had already exited the Jeep and went into the home?

A.   That's correct.

Q.   Okay.  And then you went up to the upper apartment, right?

A.   That's correct.

Q.   Now, you had gotten a warrant for the upper apartment,
correct?

A.   Yes.

Q.   And you had gotten a warrant for the upper apartment based
on the fact that the black Jeep was parked in the driveway,
correct, of 43 Ruspin?

A.   No, that's not correct.

Q.   You had sworn that -- to a judge that the basis of your --
wanting your warrant was because the black Jeep of John Thurman
was parked at 43 Ruspin but that the light bill or some other
bill was -- belonged to someone named Christian Ladd.  Do you
recall that?

A.   Yes, but that was not the basis for the warrant.

Q.   And that -- and that made you suspect, right, because John
Thurman's black Jeep was parked in a place where the utility
bill belonged to a Christian Ladd, right?

A.   No, it didn't make any suspect.

Q.   Well, and at some point because you were concerned about
John Thurman's black Jeep being parked at 43 Ruspin at a place

1 where the utility bill was registered to Christian Ladd, you

2 told the judge that, in fact, there was something suspect about

3 it and that you had done a garbage pull, correct?

4 A.  I did not say the fact that the utility bill was in

5 Christian Ladd's name or the fact that John Thurman's vehicle

6 was parked in the driveway were suspect at all.

7 　　　　MS. MARANGOLA:  What exhibit are you looking at?

8 　　　　(Off the record discussion.)

9

10 　　　　MR. PENDERGRASS:  May I approach, Your Honor?

11 　　　　THE COURT:  Yes.

12 BY MR. PENDERGRASS:

13 Q.  Detective, showing you what's been marked as Government

14 Exhibit 93, can you tell me what that is?

15 A.  Yes, this is a search warrant that I prepared for 43

16 Ruspin Avenue, upper apartment.

17 Q.  Upper apartment, correct?

18 A.  Yes, sir.

19 Q.  And can you turn to the next page on that and just read

20 the first paragraph to yourself.

21 A.  Are you referring to paragraph 2?

22 Q.  The first paragraph on the second page.  I'm sorry, can

23 you read paragraph 2(a)(1) to yourself.

24 　　　　Part of your concern in applying for this warrant was that

25 you had saw John Thurman's vehicle parked during September,

1  October, and November of 2011, in the driveway of 43 Ruspin,

2  correct?

3  A.   Yes, I listed some of the facts in the warrant.

4  Q.   And that you had observed that vehicle parked on multiple

5  occasions in the driveway during all times of night and day,

6  correct?

7  A.   That's correct.

8  Q.   All right.  And at some -- and your concern there was that

9  that vehicle was parked in a place where the National Fuel bill

10  was in the name of a person named Christian Ladd, right?

11  A.   I wasn't concerned.

12  Q.   Okay.  Now, I think that on about October 10th -- well, by

13  the way, before -- during the entire time that you had

14  Mr. Howard under observation, did you see him handle any drugs?

15  A.   No, sir.

16  Q.   Did you see him pass off any drugs to anybody?

17  A.   No, sir.

18  Q.   Did you see him make drops from location to location?

19  A.   No, sir.

20  Q.   And part of what -- and part of good investigatory

21  techniques are -- is following people from location to location

22  seeing the people that they are involved in, correct?

23  A.   That's correct.

24  Q.   Did you follow Mr. Howard during the daytime?

25  A.   I don't recall.

1  Q.   Okay.  Did you learn during your investigation that

2  Mr. Howard was, in fact, employed during the daytime?

3  A.   During our investigation, no.

4  Q.   So during the investigation you didn't know that

5  Mr. Howard was employed at a place called Corsi Automotive?

6  A.   No, sir.

7  Q.   And that's because you really didn't have an investigation

8  going on of Mr. Howard, right?

9            MS. MARANGOLA:  Objection, Your Honor.

10            THE COURT:  He can answer.

11            THE WITNESS:  That's incorrect.

12  BY MR. PENDERGRASS:

13  Q.   Okay.  So you didn't know where Mr. Howard was employed at

14  or whether or not he was employed?

15  A.   No, sir.

16  Q.   Did you know where Mr. Howard resided?

17  A.   No.

18  Q.   So you're investigating Mr. Howard from March of 2010, to

19  November of 2011, you don't even know where he resides?

20  A.   No, sir.

21  Q.   Now, you applied for that search warrant based on a

22  garbage pull that you had done on November of -- November 10th

23  of 2011, right, the warrant for 43 Ruspin upper?

24  A.   I don't recall the exact date, but it was -- it would have

25  been within ten days of November 16th.

1    Q.   Okay.  And the garbage pull -- and the warrant was based

2    on information that you had about a John Thurman, correct?

3    A.   That's correct.

4    Q.   All right.  And, in fact, you described John Thurman in

5    that -- in your application, correct?

6    A.   That's correct.

7    Q.   All right.  And so you were looking for him in terms of

8    his drug activities, right?

9    A.   That's correct.

10   Q.   All right.  Now, prior to that time, you had not requested

11   a warrant for 93 Elmer?

12   A.   No, sir.

13   Q.   All right.  And you had 93 Elmer under observation as

14   well, correct?

15   A.   That's correct.

16   Q.   All right.  Now, when you went up -- and you searched

17   Mr. Thurman's apartment, correct?

18   A.   Correct.

19   Q.   And you were the one involved in the search, right, of the

20   apartment?

21   A.   The upper apartment?

22   Q.   Yes.

23   A.   Yes.

24   Q.   And what did you find?

25   A.   I don't recall.

1  Q.   Okay.  Now, at some point you came downstairs from 43

2  Ruspin, right?

3  A.   That's correct.

4  Q.   All right.  And you ran into, I believe, the person you

5  called -- you said was Myron Johnson, right?

6  A.   That's correct.

7  Q.   Now, I believe you said that you were -- were you

8  observing -- excuse me -- were you investigating Myron Johnson

9  from March of 2010, forward as well?

10 A.   Not specifically Myron Johnson.

11 Q.   Okay.  Did you have any information about Myron Johnson?

12 A.   The only information that we had was his first name,

13 Myron.

14 Q.   Okay.

15 A.   And that he was originally from Butler Street in the City

16 of Buffalo.

17 Q.   Okay.  And -- but you didn't go to 43 Ruspin looking for

18 Myron Johnson?

19 A.   No, sir.

20 Q.   Okay.  And when -- when you entered 43 Ruspin, you had an

21 idea that Myron Johnson lived there?

22 A.   No.

23 Q.   So as you're coming downstairs, you encounter Myron

24 Johnson, correct?

25 A.   That's correct.

1  Q.   And you learned that Myron Johnson lives at 43 Ruspin,

2  correct?

3  A.   Yes.

4  Q.   Now, prior to encountering Myron Johnson, how long had

5  Myron Johnson been on your radar?

6  A.   Initially Myron Johnson -- or Myron, black male from

7  Butler Street who later turned out to be Myron Johnson was

8  mentioned in the conversation that we had in the -- in March of

9  2010.

10  Q.   And you didn't know where Myron Johnson lived in March of

11  2010?

12  A.   No, sir.

13  Q.   All right.  You didn't know where Harold Howard lived in

14  March of 2010?

15  A.   That's correct.

16  Q.   And, in fact, if you recall, where was Mr. Howard's Hummer

17  registered to?

18  A.   I don't recall.

19  Q.   So you don't recall where his Hummer was registered at,

20  right?

21  A.   That's correct.

22  Q.   You don't know where he lived in March of 2010, right?

23  A.   That's correct.

24  Q.   In fact, in November of 2011, you didn't know where he

25  lived, right?

1  A.  That's correct.

2  Q.  Now, so Myron Johnson -- you're talking with Myron

3  Johnson, correct, at 43 Ruspin?

4  A.  That's correct.

5  Q.  I believe you testified that Myron Johnson's mother then

6  opens the door?

7  A.  That's correct.

8  Q.  And that would be Ms. Deborah Lee, correct?

9  A.  That's correct.

10  Q.  And now -- now, with -- so Ms. Lee opens up the door,

11  correct?

12  A.  That's correct.

13  Q.  And that's when I believe you say you look inside and see

14  marijuana?

15  A.  Not initially.

16  Q.  Not initially.  At what point did you see marijuana?

17  A.  After Ms. Lee had invited me into the apartment.  There

18  was a lot of law enforcement activity in the hallway and

19  outside.  She invited me in the apartment to talk about what

20  the commotion was and if her son was okay.

21  Q.  Okay.  Now, when you -- when you ran into Mr. Johnson, did

22  you ask him what he was doing on the property?

23  A.  Yes.

24  Q.  And did he enter that property with a key?

25  A.  I don't recall.

1   Q.   Okay.  And did you learn that Mr. Johnson lived there?

2   A.   Yes.

3   Q.   Okay.  And then you entered the lower apartment, correct?

4   A.   That's correct.

5   Q.   And in the lower apartment is where you encountered

6   Deborah Lee, correct?

7   A.   That's correct.

8   Q.   And Deborah Lee is Myron Johnson's mother, correct?

9   A.   That's correct.

10   Q.   And in the apartment where you encountered Deborah Lee

11   there was two children, correct?

12   A.   Yes, one or two children.

13   Q.   All right.  And when you encountered Ms. Lee in the

14   apartment, you also saw drugs in the apartment, correct?

15   A.   That's correct.

16   Q.   I believe you saw marijuana, correct?

17   A.   That's correct.

18   Q.   Marijuana on the scale, right?

19   A.   What we initially believed to be a scale.

20   Q.   Okay.  What was it on eventually?

21   A.   I don't recall.

22   Q.   Okay.  Now, at some point I believe you testified that you

23   asked Ms. Lee if you could conduct a search of the house

24   because you saw marijuana in plain view?

25   A.   That's correct.

1   Q.  And she did not consent?

2   A.  That's correct.

3   Q.  Did you ask Mr. Johnson if you could conduct a search?

4   A.  Yes.

5   Q.  Did he consent?

6   A.  No, he did not.

7   Q.  Okay.  And so at that point you went and got a warrant for

8  the search of 43 Ruspin lower, correct?

9   A.  Yes, at that point we applied far a warrant for both 43

10  Ruspin in the lower and also for the Jeep located in the

11  driveway at 43 Ruspin.

12   Q.  Okay.  Now, prior to that, that house, 43 Ruspin lower,

13  wasn't on your radar for any drug activity, right?

14   A.  Yes, it was.

15   Q.  Well, 43 Ruspin lower was on your activity?

16   A.  No, 43 Ruspin --

17   Q.  Upper was on your radar for drug activity, right?

18   A.  Yes, along with the property due to the vehicles that were

19  located in the driveway.

20   Q.  Okay.  And what vehicles were located in the driveway?

21   A.  Previously the 2008 Hummer owned by Mr. Howard was located

22  in the rear of 43 Ruspin, and also Mr. Johnson's Jeep was also

23  located there.

24   Q.  Well, when you -- when you applied for your warrant for 43

25  Ruspin -- for 43 Ruspin apartment upper, you didn't apply for a

1   warrant to search a black 2007 Jeep, right?

2   A.   That's correct.

3   Q.   You didn't apply for a warrant to search a 2008 Hummer,

4   right?

5   A.   That's correct.

6   Q.   You simply applied for a warrant to search 43 Ruspin

7   upper, correct?

8   A.   That's correct.

9   Q.   And, by the way, you didn't even know that Myron Johnson

10  was the person that was operating the 2007 Cherokee Jeep,

11  right?

12  A.   That's correct.

13  Q.   And I think you testified that you got Myron Johnson's

14  name early in your investigation in March of 2010?

15  A.   His first name, yes.

16  Q.   All right.  And you were not able to locate Myron Johnson

17  up until on or about November 16th, 2011, right?

18  A.   That's correct.

19  Q.   It wasn't a very good investigation, was it?

20          MS. MARANGOLA:  Objection, Your Honor.

21          THE COURT:  Sustained.

22  BY MR. PENDERGRASS:

23  Q.   Okay.  Now, so up until November 16th, 2011, -- and you

24  would agree with me from March of 2010, to November 16th of

25  2011, is approximately 20 months?

1  A.   Yes.

2  Q.   Okay.  And up until that time, you didn't know Myron

3  Johnson, right?

4  A.   That's correct.

5  Q.   You had not seen Harold Howard go in and out of 93 Elmer,

6  right?

7  A.   No.

8  Q.   And you had not seen Harold Howard go in and out of 43

9  Ruspin?

10        MS. MARANGOLA:  Objection, asked and answered.

11        THE COURT:  Sustained.

12  BY MR. PENDERGRASS:

13  Q.   Now, when you went into Myron Johnson's home at 43 Ruspin,

14  you began to search the home?

15  A.   After we applied for a search warrant.

16  Q.   After you got the search warrant, you searched the home,

17  right?

18  A.   Yes, sir.

19  Q.   And then began to find drugs in the house?

20  A.   That's correct.

21  Q.   Okay.  Now I'm showing you what's been marked as

22  Government Exhibit 1D in evidence.  That's a couch, correct?

23  A.   That's correct.

24  Q.   And inside that couch is where you found drugs, correct?

25  A.   That's correct.

1   Q.   And I think you -- those -- the drugs that you found in

2   that couch, was those drugs packaged for sale?

3   A.   Yes.

4   Q.   Okay.  I believe you testified that the drugs were heat

5   sealed, right?

6   A.   Yes.

7           MS. MARANGOLA:  What exhibit number is up on the

8   screen?

9           MR. PENDERGRASS:  1D.

10          MS. MARANGOLA:  1D, thank you.

11  BY MR. PENDERGRASS:

12  Q.   I'm showing you what's been marked as Government

13  Exhibit 1E.  Is that -- that's a picture of the drugs, correct?

14  A.   Yes, sir.

15  Q.   That you took out of the couch in the apartment that Myron

16  Johnson lived in, correct?

17  A.   Yes, sir.

18  Q.   And that's -- 1E is a picture of the drugs as they were

19  sealed in the compartment in the couch, right?  They were

20  vacuum sealed, right?

21  A.   That's correct.

22  Q.   Those drugs.

23      I'm showing you a picture of 1J in evidence, Government

24  Exhibit 1J in evidence.  I believe you testified that the item

25  off to my left, which is the white item in the picture, do you

1    see that?

2    A.    The heat sealer.

3    Q.    Yeah.  That's the heat sealer, correct?

4    A.    That's correct.

5    Q.    And if you would make a mark at the heat sealer so that

6    the jury can see.

7          All right.  And that heat sealer was found in Myron

8    Johnson's home, correct?

9    A.    That's correct.

10   Q.    All right.  Now, you never saw Harold Howard handle any of

11   these drugs, correct?

12   A.    No, sir.

13   Q.    Now, so you conducted a search of the house, correct?

14   A.    Yes.

15   Q.    And you found drugs in the couch, right?

16   A.    Yes.

17   Q.    What else did you find in the house, Detective?

18   A.    We found a safe in the rear right bedroom of the

19   apartment.

20   Q.    All right.  And what else?

21   A.    Money counter also located in the apartment.

22   Q.    Money counter.  And what else did you find -- well, let me

23   ask you:  Did you find a digital scale in the house?

24   A.    I don't recall.

25   Q.    All right.  Did you find a -- what was described as a Coby

1  Kyros digital device with marijuana residue on its face?  Did

2  you find something like that in the house?

3  A.   We found marijuana on a device.  I don't know if that was

4  the exact device.

5          MR. PENDERGRASS:  May I approach, Your Honor?

6          THE COURT:  Yes.

7  BY MR. PENDERGRASS:

8  Q.   Detective, I'm showing you what's been marked as

9  Government Exhibit 2.  Can you tell us what that is?

10 A.   This is a search warrant that I prepared for 43 Ruspin in

11 the lower apartment and also for a 2007 Jeep Grand Cherokee,

12 black in color.

13 Q.   Okay.  And can you tell me whether or not attached to

14 Government Exhibit 2 for identification, whether or not there's

15 attached a return on warrant?

16 A.   Yes, sir.

17 Q.   Okay.  And whether or not the return on warrant includes a

18 property receipt?

19 A.   Yes, it includes two.

20 Q.   Two pages of property receipt?

21 A.   Yes, sir.

22 Q.   Now, I want you to turn your attention to the last page of

23 the document which is the second page of the property receipt.

24 All right.  And I want you to look at that and read it to

25 yourself.

1     Okay.  Did you recover a digital scale from the house, a
2  super balanced digital scale?
3  A.   I did not, but a colleague did.
4  Q.   Okay.  Did you or your colleagues recover a Coby Kyros
5  digital device with marijuana residue on it?
6  A.   Yes.
7  Q.   Okay.  Did you also recover from the house ecstasy
8  tablets?
9  A.   Yes, a colleague did.
10  Q.   Okay.  And, by the way, approximately how many ecstasy
11  tablets did you recover from the house?
12  A.   Under 50.
13  Q.   Okay.  Detective, I think you said that after uncovering
14  all of this stuff in the house, did you have a conversation
15  with Mr. Myron Johnson?
16  A.   Yes, sir.
17  Q.   And did you explain to Mr. Johnson that you were looking
18  to gain some information on Harold Howard and that he could
19  help himself if he gave you information?
20  A.   Not specifically to Harold Howard.
21  Q.   Okay.  Did you say anything specifically to him about
22  Harold Howard?
23  A.   Yes, about Harold Howard's association with 93 Elmer
24  Street.
25  Q.   Okay.  And at that time you had to have asked him if he

1  knew Harold Howard, right?

2  A.   That's correct.

3  Q.   All right.  Because you didn't know that this was the

4  Myron Johnson that your confidential source had given you the

5  first name Myron back in March of 2010, right?

6  A.   That's correct.

7  Q.   So you didn't know that the two were the same, right?

8  A.   Not at that point, no.

9  Q.   Okay.  And so you had to -- in fact, you had to ask him if

10 you knew a person named Harold Howard, right?

11 A.   No.  I was aware that they knew each other.  They were

12 located in the same vehicle.

13 Q.   Okay.  So prior to that you knew that Harold Howard was in

14 the vehicle?

15 A.   Prior to my conversation with Myron Johnson?

16 Q.   Yes.

17 A.   Yes.

18 Q.   Okay.  And you told Myron Johnson that you were interested

19 in Harold Howard and to -- so that he could help himself by

20 giving you information on Harold Howard, right?

21          MS. MARANGOLA:  Objection, asked and answered.

22          THE COURT:  Overruled.

23          THE WITNESS:  I advised Mr. Johnson that we, I, was

24 aware of he and Mr. Howard's drug activity and how Mr. Howard

25 was transporting cocaine from Atlanta to Buffalo, and that we

knew that 93 Elmer was a stash location, a location where

Mr. Howard hid drugs.

BY MR. PENDERGRASS:

Q.    Okay.  And then you told Mr. Johnson that he could help

himself if he gave you some information?

A.    That's correct.

Q.    Okay.  Now, in helping himself, Mr. Johnson told you that

none of the drugs that you found at his house belonged to him,

right?

MS. MARANGOLA:  Objection, hearsay.

THE COURT:  Sustained.

MR. PENDERGRASS:  Your Honor, that's part --

THE COURT:  When I make a ruling, that's it.  Okay.

I don't want any arguments.

MR. PENDERGRASS:  Understood.

THE COURT:  No further discussion, I make a ruling,

that's it.

MR. PENDERGRASS:  Understood, Your Honor.  Thank you.

BY MR. PENDERGRASS:

Q.    Now, during your investigation you then found a gun in the

house, right?

A.    Yes.

Q.    And where did you find that gun?

A.    It was located in the basement of the residence.

Q.    Okay.  And in the -- where was it in the basement of the

```
1    residence?  Where exactly was it located?

2    A.    I believe it was in and around a dryer, washer.

3    Q.    Okay.  Now, you found a bunch of money in the house,

4    right?

5    A.    That's correct.

6    Q.    And you found that money in a safe, right?

7    A.    That's correct.

8    Q.    And that money was in the safe in Myron Johnson's room?

9    A.    That's correct.

10   Q.    And I believe you testified that Myron Johnson had to help

11   you get into the safe?

12   A.    Yes, sir.

13   Q.    Okay.  Was it a combination to the safe?

14   A.    No, Mr. Johnson had a key for the safe.

15   Q.    He had a key for the safe.  So he opened the safe with

16   the -- with his key?

17   A.    That's correct.

18   Q.    All right.  Now, you didn't get a key off of the key ring

19   of Mr. Howard, right, for that safe?

20   A.    Not for that safe, no.

21   Q.    Okay.  By the way, did you get a key off the key ring of

22   Mr. Howard for 43 Ruspin?

23   A.    I don't know because we didn't try any of Mr. Howard's

24   keys in the residence.

25   Q.    Okay.
```

THE COURT:  We'll take a 15-minute recess, ladies and
gentlemen.  We'll resume at 3:00.  The Court will be in recess.

(A recess was taken at 2:53 p.m.)


(Jury present in the courtroom at 3:04 p.m.)

MR. PENDERGRASS:  May I, Your Honor?

THE COURT:  Yes, please.

BY MR. PENDERGRASS:

Q.   Now, Detective, now, at some point after Mr. Johnson went
in the room and got you the money, did you -- did you then
leave the house?

A.   No.

Q.   Okay.  What did you do next?

A.   The money was counted.

Q.   Excuse me?

A.   The money was counted.

Q.   Okay.  So you counted the money.  Did you count it
individually or did you use the money machine?

A.   We did not use the money machine.

Q.   Okay.  Where was the money machine found?

A.   I don't recall.

Q.   Okay.  If you -- would Government Exhibit --

A.   2.

Q.   -- 2 assist you in recalling where the money machine was
located?

1  A.   Yes, sir.  I don't see it on here.

2  Q.   But there was a money machine, and you didn't use that to

3  count the money?

4  A.   No.

5  Q.   Now, after -- at some point you testified you went outside

6  and you witnessed drugs in the vehicle.  Do you recall that?

7  A.   Yes, sir.

8  Q.   I'm showing you what's been marked as Government

9  Exhibit 1A.  That's the vehicle -- that 2007 black Jeep,

10  correct?

11  A.   That's correct.

12  Q.   And in that -- that's a picture showing that the Jeep is

13  tinted, right?

14  A.   It doesn't show that, I believe.  What we're seeing here

15  in the back window is factory.

16  Q.   It's factory tint?

17  A.   Yes.

18  Q.   So it's tinted, it's showing a tint on the vehicle, right?

19  A.   The rear of the vehicle, yes.

20  Q.   And then you went out, and in that vehicle in a -- I think

21  you said in a compartment on the driver's side of the vehicle,

22  is where drugs was located, correct?

23  A.   That's correct.

24  Q.   I'm showing you what's been marked as Government

25  Exhibit 1B in evidence.  That's the -- that's where the

1   compartment was?

2   A.   That's correct.

3   Q.   Okay.  And I believe you said that there was a black

4   sweatshirt that was stuffed in the -- into that area where the

5   compartment was?

6   A.   That's correct.

7   Q.   Okay.  And I believe you testified that contained within

8   that black sweatshirt was some drugs, right?

9   A.   That's correct.

10   Q.   I'm showing you what's been marked as Government

11   Exhibit 1C in evidence.  And I believe you came out and you --

12   you came out of the house and you witnessed the drugs that were

13   on the seat of the car, right?

14   A.   That's correct.

15   Q.   All right.  And the -- and these drugs were located inside

16   of that -- or wrapped in that black jacket, correct?

17   A.   Correct.

18   Q.   All right.  And that black jacket was stuffed in -- if you

19   look to the left, that black jacket -- and I'm looking at my

20   left, of course, which would be your left -- the black jacket

21   was stuffed in that area where the arrow has appeared, right?

22   A.   Yes, just behind the plastic shelf compartment.

23   Q.   Okay.  And that was the vehicle that -- the 2007 Jeep was

24   the vehicle that Mr. Johnson was driving?

25   A.   That's correct.

1    Q.   Correct.  Now, was -- was Mr. -- was Mr. Johnson then

2    placed under arrest?

3    A.   Yes.

4    Q.   Okay.  And prior to being placed under arrest, you had a

5    conversation with Mr. Johnson that led you to get a search

6    warrant for 93 Elmer, correct?

7    A.   That's correct.

8    Q.   All right.  Did -- what is a 710.30 notice?

9    A.   It's a notice --

10         MS. MARANGOLA:  Objection, Your Honor.  710.30 notice

11    as it pertains to Myron Johnson will contain all hearsay

12    allegations.

13         THE COURT:  What is a 710 notice?  He's just asking

14    what it is, just generally, I guess.

15         You may answer, sir.

16         THE WITNESS:  710.30 notice is a document showing

17    what a suspect had said.

18    BY MR. PENDERGRASS:

19    Q.   Okay.  And did you take a 710.30 notice?

20    A.   Yes, sir.

21    Q.   Of Mr. Johnson?

22    A.   Yes.

23    Q.   Okay.  And that 710.30 notice you took was because of the

24    search at 43 Ruspin you had just conducted?

25    A.   That's correct.

```
 1              MR. PENDERGRASS:  May I approach, Your Honor?

 2              THE COURT:  Yes.

 3   BY MR. PENDERGRASS:

 4   Q.   I'm showing you what's been marked as Government

 5   Exhibit 88.  Can you just look at that exhibit and leaf through

 6   it and tell me what it is without reading it out to the jury.

 7   A.   These are informations, arrest informations prepared for

 8   the arrest of Myron Johnson and Harold Howard.  Also

 9   contained -- last two pages are -- is a 710.30 notice.

10   Q.   And a 710.30 notice is just a statement -- is a warning of

11   a statement -- by the way, did you read to Mr. Johnson his

12   rights?

13              THE COURT:  Why are we talking about Mr. Johnson?

14   There was no real direct testimony about him.  This is way

15   beyond direct testimony.  Are you going to object or not?

16              MS. MARANGOLA:  Objection, Your Honor.

17              THE COURT:  Sustained.

18              MR. PENDERGRASS:  Thank you.

19   BY MR. PENDERGRASS:

20   Q.   So then you go over to 93 Elmer, correct?

21   A.   That's correct.

22   Q.   Well, prior to going over to 93 Elmer, you get a search

23   warrant, correct?

24   A.   Correct.

25   Q.   All right.  And you get a search warrant, and you execute
```

1   that search warrant?

2   A.   Ultimately, yes.

3   Q.   Okay.  And when you go into 93 Elmer, what do you find

4   there?

5   A.   I found a heat sealer in the residence.  There was

6   clothing on the floor everywhere.  Located in the backyard two

7   pit bulls, and then located in the detached garage Mr. Howard's

8   Hummer.

9   Q.   Okay.  Did you find any information at 93 Elmer that

10  directly tied Myron Johnson to 93 Elmer?

11           MS. MARANGOLA:  Objection to the form of the

12  question, Your Honor.

13           THE COURT:  Do you understand the question, sir?

14           THE WITNESS:  Yes, sir.

15           THE COURT:  You can answer.

16           THE WITNESS:  No.

17           MR. PENDERGRASS:  May I approach, Your Honor?

18           THE COURT:  Yes, fine.

19  BY MR. PENDERGRASS:

20  Q.   Showing you what's been marked as Government Exhibit 17

21  for identification.  Tell me what that is.

22  A.   This is a search warrant that I prepared for 93 Elmer

23  Street and also for Mr. Howard's rental vehicle.

24  Q.   Okay.  And I want you -- and contained in that document is

25  a return on warrant, correct?

A. Yes.

Q. All right. And in that -- those -- and there was some boxes and stuff in the house when you went in, right? It looked like someone was moving in, Detective?

A. No.

Q. Okay. Did you find some information in that house relative to Myron Johnson?

A. I did not, no.

Q. Did you -- did one of your colleagues find information in that house relative to Myron Johnson?

A. Yes.

Q. Okay. Found mail in that house for Myron Johnson, right?

A. Yes.

Q. And you also found birth certificates in that house from Myron Johnson's children, correct?

A. Yes.

Q. Detective, you also learned that during the course of your investigation that the 93 Elmer was actually rented to Deborah Lee, correct?

A. I did not learn that.

Q. So you didn't know that Deborah Lee, Myron Johnson's mother, was renting the property from Paula Cruz as of November 11th, 2011?

A. At this time I did not know that.

Q. Okay. But you were -- you were -- during your

1  investigation you were observing 93 Elmer, correct?

2  A.   That's correct.

3  Q.   And during your investigation did you become aware that

4  there was some significant work being done on 93 Elmer?

5  A.   No.

6  Q.   You didn't see anyone working on 93 Elmer repairing the

7  roofs?

8          MS. MARANGOLA:  Objection, asked and answered.

9          THE COURT:  Well, overruled.

10          THE WITNESS:  No, sir.

11  BY MR. PENDERGRASS:

12  Q.   You didn't see anyone on 93 Elmer -- at 93 Elmer

13  installing water-resistant plywood and sheathing?

14  A.   No, sir.

15  Q.   You didn't see anyone at 93 Elmer installing 30-year

16  singles to 93 Elmer?

17  A.   No, sir.

18  Q.   You didn't see a crew working on 93 Elmer to remove

19  damaged drywall from the kitchen ceiling?

20          THE COURT:  How could he observe that from the

21  street?  What, was he driving around in the kitchen?

22          MR. PENDERGRASS:  Yeah.

23  BY MR. PENDERGRASS:

24  Q.   Did you observe anyone working at 93 Elmer?

25          THE COURT:  Did you see inside the house, sir?

1          THE WITNESS:  No, sir.

2    BY MR. PENDERGRASS:

3    Q.   Okay.  So during the course of your investigation, you

4    didn't even observe workers going out of 93 Elmer doing work at

5    93 Elmer to prepare for rental?

6    A.   That's correct.

7    Q.   And you didn't know that Myron Johnson and Deborah Lee,

8    his mother, had rented 93 Elmer?

9    A.   No.

10   Q.   All right.  And you didn't determine that information

11   either during your investigation or subsequent to your

12   investigation?

13   A.   Afterwards I was aware of Ms. Lee renting the house at 93

14   Elmer Street.

15   Q.   All right.  And did you become aware that Ms. Lee rented

16   the house at 93 Elmer before November 16th, 2011?

17   A.   No.

18   Q.   Well, it's clear that she had -- her and Myron Lee had

19   their stuff inside of 93 Elmer on about November 16th, 2011,

20   right?

21   A.   There's a piece of mail and some birth certificates.

22   Q.   All right.  You didn't see Harold Howard handling Myron

23   Johnson's mail and his children's birth certificates, right?

24   A.   No.

25          THE COURT:  You didn't see that or you did see it?

1      THE WITNESS:  I did not see Mr. Howard handling those

2 documents.

3 BY MR. PENDERGRASS:

4 Q.   All right.  Now, Detective, I think you said you went

5 in -- you went into the house through the front door, correct?

6 A.   That's correct.

7 Q.   All right.  And I think you said you used the key that was

8 on Mr. Howard's key ring to enter into the house through the

9 front door?

10 A.   That's correct.

11 Q.   All right.  And when you got into the house through the

12 front door, you went into the backyard, correct?

13 A.   Yes, eventually we made it to the back of the residence.

14 Q.   Okay.  So there wasn't anything that you had to do special

15 in order to gain entry to the backyard from the house?

16 A.   I don't recall.

17 Q.   Well, let me ask my question this way:  Were you able to

18 open up a door inside of the house and go into the backyard?

19 A.   We traveled through a door.  I don't recall if we opened

20 it or if we used keys to open it.

21 Q.   Okay.  And once you got through the door, you got into the

22 backyard, I believe, right?

23 A.   Yes, we began to walk out the back door.

24 Q.   Now, you said there was clothes thrown all around the

25 house?

1  A.   Yes.

2  Q.   And those clothes didn't give you the appearance that

3  someone was living there?

4  A.   No.

5  Q.   Okay.  Do you know whose clothes those were?

6  A.   No, sir.

7  Q.   Now, you said that you were met at the rear -- rear door

8  by some dogs, right?

9  A.   That's correct.

10  Q.   And I think you said you spray painted -- that you

11  spray -- pepper sprayed one of the dogs?

12  A.   That's correct.

13  Q.   And I think you testified that one dog was docile and the

14  other dog was being aggressive?

15  A.   That's correct.

16  Q.   But at some point both dogs moved to their cage?

17  A.   Yes, after a period of time.

18  Q.   Okay.  And it was at that time -- I believe you testified

19  that once the dogs went in the cage, that then one of your

20  officers shot one of the dogs?

21  A.   At that point while we began to travel into the yard

22  towards the garage, between the garage and the cages, we were

23  going to attempt to latch a couple of the cages to keep the

24  dogs secured, but, again, they were -- they were extremely

25  aggressive and we -- one dog extremely aggressive as we came

off the porch.  We were kind of lined up one by one, and as he

was seated in his cage growling and barking --

Q.   But he was in the cage?

A.   An open cage.

Q.   Okay.  Now, who's the first one to the garage?

A.   I don't recall.

Q.   Could that have been Officer Hawthorne or Detective

Carney?

A.   It could have been, yes.

Q.   Okay.  And is it possible that they, in fact, broke into

the garage door?

A.   No, a key was utilized.

Q.   Did you use the key?

A.   No, sir.

Q.   So you didn't use the key to get into the door?

A.   No, sir.

Q.   And if -- if Detective Hawthorne or Detective Carney said

that they used -- they actually broke into the garage, would

that -- I mean, would that cause you to reconsider your

testimony?

         MS. MARANGOLA:  Objection, Your Honor, form.

         THE COURT:  Sustained.  We're not testifying about

possibilities here.  You can talk about what he knows.

BY MR. PENDERGRASS:

Q.   Okay.  Now, after you got into the garage -- and, by the

1   way, you don't know who put the 2008 Hummer in the garage?

2   A.   No, sir.

3   Q.   And up to that point you had not seen Harold Howard even

4   operate the 2008 Hummer, correct?

5   A.   That's correct.

6   Q.   All right.  I think you then testified that you had the

7   key to the Hummer, correct?

8   A.   That's correct.

9   Q.   Then you pull the Hummer out, right?

10   A.   Yes, sir.

11   Q.   And then I think you said based on the fact that there was

12   a crowd developing in -- for officers' safety you decided not

13   to search the vehicle there?

14   A.   Based on the crowd and the fact that there were

15   individuals driving by pointing flashlights into the driver

16   portion of some of our undercover vehicles, I decided that it

17   was completely unsafe and this vehicle needed to be transported

18   to 45 Elm Street.

19   Q.   Okay.  And then you took the vehicle to 45 Elm Street,

20   correct?

21   A.   Yes, sir.

22   Q.   And that's where you conducted your search?

23   A.   That's correct.

24   Q.   I'm showing you what's been marked as Government

25   Exhibit 18 -- 18D in evidence.  That vehicle -- that's the 2008

1  Hummer, correct?

2  A.   Yes, sir.

3  Q.   And that's the vehicle while it's opened in -- at 45 Elm?

4  A.   That's correct.

5  Q.   Okay.  Now, I think you said on -- when -- on direct

6  examination that the -- initially when you -- when you looked

7  at the vehicle, that the top was not open, the top of the wheel

8  well was not open, right?

9        THE COURT:  Talking about the separation between the

10 back seat and the cargo area?

11       MR. PENDERGRASS:  I'm talking about the wheel well,

12 Your Honor.

13       THE COURT:  What are we talking about?

14       MR. PENDERGRASS:  The wheel well.

15       THE COURT:  Okay.

16 BY MR. PENDERGRASS:

17 Q.   On the left-hand side of the vehicle where you see -- in

18 that area where you see the line that I've just made -- and

19 that's the wheel well, right?  Is that where the drugs was

20 located?

21 A.   That's correct.

22       THE COURT:  Underneath that there's a cloth or

23 blanket or something?

24       THE WITNESS:  No, Judge, just the --

25       THE COURT:  Over on the left-hand side?

 1              THE WITNESS:  Top left.

 2              THE COURT:  The wheel well is below that blanket or

 3    whatever it is, I assume.

 4              THE WITNESS:  I'm not positive.

 5              THE COURT:  Pardon me?

 6              THE WITNESS:  I'm not positive.  I'm referring to it

 7    as a plastic compartment.

 8              MR. PENDERGRASS:  I apologize, Your Honor.  I was

 9    referring to it as the wrong thing.

10              THE COURT:  What?

11              MR. PENDERGRASS:  I was referring to it as the wrong

12    thing.

13              THE COURT:  Okay.

14    BY MR. PENDERGRASS:

15    Q.    Okay.  And in that plastic compartment, that was

16    originally closed, right?

17    A.    That's correct.

18    Q.    Somehow it got opened.  Do you recall, how did it get

19    opened?

20    A.    Yes, I had opened that just after we arrived at 45 Elm

21    Street, popped up the plastic part there, and seen that we had

22    some possible contraband.  I would have then set it back on top

23    so we could take a picture of it just to show the --

24    Q.    I'm sorry.  I apologize, Detective.

25    A.    -- just to show how that fit into place.

1  Q.   Detective, I'm just curious, you took pictures of the Jeep

2  Cherokee on -- as shown in Government Exhibit 1A.  You took

3  pictures of that Jeep Cherokee while it was outside on

4  November 16th, 2011, right?

5  A.   We took pictures of the residence and also the Jeep

6  Cherokee.

7  Q.   Okay.  But you didn't take pictures of the Hummer as it

8  was positioned inside of the garage, correct?

9  A.   That's correct.

10  Q.   All right.  Also you said there was a -- another vehicle,

11  a Sport -- a Kia Sportage, correct?

12  A.   That's correct.

13  Q.   All right.  And you didn't take pictures of that Kia

14  Sportage?

15  A.   No, sir.

16  Q.   You didn't take pictures of the house, 93 Elmer, when you

17  got to 93 Elmer, right?

18  A.   The inside of the house?

19  Q.   The outside of the house, that night, did you take

20  pictures?

21  A.   I don't recall.

22  Q.   Okay.  You didn't produce any pictures for the prosecutor,

23  right?

24  A.   I did not, no.

25  Q.   Okay.  In fact, there are no pictures relative to the ways

1   in which the vehicles and the house looked on November 16th,

2   2011, right?

3   A.   That's correct.

4          MR. PENDERGRASS:  Give me one second, Your Honor.

5          I don't have anything further, Your Honor.

6          MS. MARANGOLA:  Judge, may I briefly redirect?

7          THE COURT:  All right.

8                    REDIRECT EXAMINATION

9   BY MS. MARANGOLA:

10  Q.   Deputy Granville, Mr. Pendergrass asked you about

11  surveillance of the defendant.  Do you recall that?

12  A.   Yes, sir.

13  Q.   Can you describe to the jury what type of surveillance you

14  were conducting on this defendant?

15  A.   We -- I would conduct drive-by surveillance, spot checks

16  every once in a while, spend some time sitting observing these

17  locations.

18  Q.   Did you have a car assigned to him 24 hours a day, seven

19  days a week?

20  A.   No.

21  Q.   Were you working other cases at this time as well, or was

22  this the only one?

23  A.   Yes, lots of cases.

24  Q.   Okay.  So when you say you would sit across the street or

25  surveil him, how often did that take place?

1    A.   Every couple of weeks or so spend some time on it.

2    Routinely, three times a week, multiple times a day I would

3    conduct drive-by surveillance.

4    Q.   Now, based on your training and experience, were you

5    concerned about counter-surveillance on behalf of the

6    defendant?

7            MR. PENDERGRASS:  Objection, Your Honor.

8            THE COURT:  Overruled.

9            THE WITNESS:  Yes.

10   BY MS. MARANGOLA:

11   Q.   And describe what that means to the jury and what your

12   concerns were.

13   A.   Higher level drug traffickers oftentimes conduct

14   counter-surveillance.  They can switch cars midway through.

15   They could circle the block a couple of times.  There's many

16   different ways and tactics.

17   Q.   And would that mean your cover would be blown, then?

18   A.   Yes, our cover, our vehicles.

19   Q.   And was that something that you had in mind during this

20   particular investigation?

21   A.   Absolutely.

22   Q.   You were also asked if you ever saw the defendant go into

23   93 Elmer Street.  Do you recall that?

24   A.   Yes.

25   Q.   Do you ever see the defendant at 93 Elmer Street

1   throughout your surveillance?

2   A.  Yes.

3   Q.  And when you would see the defendant at 93 Elmer Street,

4   where was he in reference to the house?

5   A.  In front of the residence.

6   Q.  You couldn't see in the house, could you?

7   A.  No.

8   Q.  So you wouldn't know if he was inside the house; fair to

9   say?

10   A.  That's correct.

11       MS. MARANGOLA:  If you can put up 18H, please, Trish,

12   which is marked into evidence.

13   BY MS. MARANGOLA:

14   Q.  Now, I'm showing you what's been received into evidence

15   as 18H, and I'd like to direct your attention to the center of the

16   photograph.  Do you see paperwork in that photo?

17   A.  Yes.

18   Q.  Did you have the opportunity on November 16th, 2011, to go

19   through that -- those items?

20   A.  A couple of the documents, yes.

21   Q.  And would one of those documents be the registration?

22   A.  Yes.

23       MR. PENDERGRASS:  Objection, Your Honor.

24       THE COURT:  Registration to what?

25       MS. MARANGOLA:  To the Hummer, Your Honor.

1    THE COURT:  Oh, overruled.

2    BY MS. MARANGOLA:

3    Q.   A few moments ago Mr. Pendergrass asked you if you recall

4    the address that was listed on the registration.  Do you

5    remember that?  Do you remember him asking you that question?

6    A.   Yes.

7    Q.   And could you recall the address that the defendant listed

8    on his registration?

9    A.   No.

10   Q.   Would reviewing the registration refresh your

11   recollection?

12   A.   Yes.

13        MS. MARANGOLA:  If I may approach, Your Honor.

14   BY MS. MARANGOLA:

15   Q.   I'm showing you what's been marked for identification as

16   Government Exhibit 63.  Without reading that out loud, does

17   that refresh your recollection to the address that the

18   defendant listed on his registration?

19   A.   Yes.

20   Q.   And where was that registration found on the night of

21   November 16th, 2011?

22   A.   It was recovered in the glove box of Mr. Howard's vehicle.

23   Q.   What was the address listed on the registration?

24   A.   It's a PO box.

25   Q.   Now, did you also hear Mr. Pendergrass ask you if you knew

1   the defendant's mailing address or where he lived?

2   A.   Yes.

3   Q.   Can someone live at a PO box?

4   A.   No.

5   Q.   Based on your training and experience with narcotics

6   investigations, are you aware whether or not high level drug

7   traffickers use real addresses or fake addresses?

8           MR. PENDERGRASS:  Objection, Your Honor.

9           THE COURT:  I'm going to sustain that.

10  BY MS. MARANGOLA:

11  Q.   Sir, you were asked earlier if there was paperwork tying

12  Harold Howard directly to 93 Elmer Street.  Do you recall that

13  line of questioning?

14  A.   Yes.

15  Q.   Do you recall when you and your colleagues searched the

16  Hummer whether or not paperwork was found?

17          MR. PENDERGRASS:  Objection, Your Honor.

18          THE COURT:  I haven't heard the question.

19          MR. PENDERGRASS:  I didn't ask if there was paperwork

20  tying Harold Howard to 93 Elmer.  There's no such line of

21  questioning.

22          MS. MARANGOLA:  I believe that was asked.  If

23  Yvonne --

24          MR. PENDERGRASS:  It was whether or not there was

25  paperwork trying Myron Johnson to 93 Elmer.

1          THE COURT:  You opened the door.  You may ask.

2          MS. MARANGOLA:  May I approach, Your Honor?

3          THE COURT:  Yes.

4    BY MS. MARANGOLA:

5    Q.   Now, Deputy Granville, I'm showing you two documents that

6    were marked for identification being 37A and 37B, and, again,

7    documents that were located in the defendant's Hummer.  Do

8    you -- do you recognize the writing or do you recognize what

9    those documents even are?

10   A.   It's listed as lease for residential property.

11   Q.   And what address does that -- is the lease for the

12   residential property for?

13   A.   93 Elmer.

14   Q.   And those were located in the defendant's Hummer during

15   the night of November 16th, 2011, by your colleague, Timothy

16   Carney?

17          MR. PENDERGRASS:  Objection, Your Honor.

18          THE COURT:  Overruled.

19          THE WITNESS:  Yes.

20          MS. MARANGOLA:  Thank you.

21   BY MS. MARANGOLA:

22   Q.   Now, earlier you were asked about Myron Johnson and when

23   it was you identified Myron Johnson by his full name.  Do you

24   recall that?

25   A.   Yes.

1   Q.   And Mr. Pendergrass asked you what information you were

2   given by Myron during the course of the investigation; isn't

3   that correct?

4   A.   That's correct.

5   Q.   Well, what information were you given by Myron during the

6   course of the investigation?

7           MR. PENDERGRASS:  Objection, Your Honor.

8           THE COURT:  Well, that was the one you objected to

9   when he asked questions about what Myron --

10          MS. MARANGOLA:  No, Your Honor.

11          THE COURT:  Where is this information coming from?

12          MS. MARANGOLA:  Well, the defense counsel opened the

13  door by asking what information he was given throughout the

14  course of the investigation about Myron Johnson, and I did not

15  object intentionally for this reason.

16          MR. PENDERGRASS:  I don't believe I opened any door,

17  Your Honor.  Objection.

18          THE COURT:  Sustained.

19          MS. MARANGOLA:  One moment, Your Honor.

20          Nothing further, Your Honor.  Thank you.

21          THE COURT:  Thank you, sir.  That's it.  You're

22  excused, sir.  You've got direct, redirect and -- cross and

23  redirect.

24          (Witness excused.)

25

1    THE COURT:  Ladies and gentlemen, it's almost the

2 time that I was going to close for the day, and I don't think

3 it -- doesn't make much sense to start a witness for 10,

4 15 minutes, so we'll adjourn today and resume tomorrow morning

5 at 9:00.  I'm having you home early.  Go to bed a little bit

6 earlier tonight.  9:00, does that sound all right?

7    THE JURORS:  Yes.

8    THE COURT:  Okay.  What did I say?  9 a.m.  Now, if

9 it's already 9:00, you're in deep trouble when you wake up.  So

10 let's make -- we'll start promptly at 9:00.  Okay?  We'll put

11 in a pretty full day in tomorrow.  Okay?

12    Ladies and gentlemen, during the recess, please do

13 not discuss the case with anyone.  Do not discuss it among

14 yourselves.  Do not form any opinion or judgement.  Wait until

15 you've heard all the evidence in this case.  The case just

16 started today.  Do not do any research, conduct any

17 investigation.  You're reminded not to mingle with the lawyers,

18 the witnesses, the parties.  Keep an open mind.  Do not form

19 any opinion, judgement, or conclusion, and wait until you've

20 heard all the evidence.

21    Drive carefully, Folks, and we'll see you tomorrow

22 morning at 9:00.  The court will be in recess.

23    (Proceedings adjourned at 3:44 p.m.)

24                        *    *    *

25

1                          CERTIFICATION

2

3          I certify that the foregoing is a correct

4   transcription of the proceedings stenographically recorded by

5   me in this matter.

6

7

8                                    S/Yvonne M. Garrison, RPR

9                                      YVONNE M. GARRISON, RPR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25